## Commonwealth *v*. Williams et al., Appellants.

*Criminal law—Murder—Evidence—Accomplices—Credibility of witnesses—Charge of court.*

1. Where the only evidence tending to connect defendants with the murder charged was that of two witnesses, one of whom was under conviction for the same crime and an avowed accomplice, while the evidence of both was seriously discredited, it was reversible error for the trial judge to charge that their testimony was of the highest importance for the consideration of the jury, without referring to the circumstances tending to discredit the two witnesses or cautioning the jury as to the testimony of an accomplice.

2. It was also error to instruct the jury that there was other evidence tending to connect the defendants with the crime, aside from that of the two witnesses, when, as a matter of fact, there was no such other evidence.

Argued May 12, 1922. Appeals, Nos. 403 and 404, Jan. T., 1922, by defendants, from judgment of O. & T. Erie Co., May T., 1921, No. 39, on verdict of guilty of murder of the first degree, in case of Commonwealth v. Edward Williams and Fred Maxwell. Before MOSCH-ZISKER, C. J., FRAZER, WALLING, SIMPSON and SCHAFFER, JJ. Reversed.

Indictment for murder.  Before HIRT, J.

The opinion of the Supreme Court states the facts.

Verdict of guilty of murder of the first degree on which sentence was passed.  Defendants appealed.

*Error assigned,* inter alia, was (6) instructions, appearing by the opinion of the Supreme Court, quoting them.

*J. R. Haughney,* with him *Lytle F. Perry,* for appellants.

*C. Arthur Blass,* District Attorney, and *Otto Herbst,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE WALLING, June 24, 1922:

These appeals by the defendants, Edward Williams and Fred Maxwell, are from judgments upon conviction of murder of the first degree.  On the night of March 10, 1921, George Mauer, watchman at the plant of the Griswold Manufacturing Company, at Erie, was murdered and robbed.  The crime was apparently committed with a heavy club, picked up in the yard and while the watchman was on the first floor, but the body was carried up in the elevator and thrown from an upper story window down upon a cement roof about forty feet below, where it was found early the next morning.  The defendants, colored men, were arrested four days later for this crime and in due time tried and convicted.  The fact of the murder and robbery was clearly proven, but the only evidence tending to connect the defendants, or either of them, therewith, was that of two other colored men, to wit, Harry Fox and Albert Howard.  The defendant Maxwell was living at 1811 Cherry Street, Erie, with a colored woman, whom we will call his wife, although they were not married, and Fox and Howard testified to a conversation they heard and participated in at Maxwell's house on the afternoon of March 2, 1921, at which

Maxwell and Williams, the defendants, arranged to go and rob the Griswold plant on Thursday (pay day) night, March 10th, and Fox testified that on the following days, March 11th and 12th, the defendants repeatedly admitted to him they had done so, told in detail how the murder and robbery were committed and divided with him the spoils of the crime. Howard testified that on Saturday forenoon, March 12th, they made similar admissions to him. We do not mention in detail all of their testimony.

The sixth error assigned is to the following passage from the charge of the trial judge, viz: "In addition to this testimony you have the testimony of Albert Howard and the testimony of Harry Fox, and we would say to you that the testimony of these two witnesses is of the highest importance for your consideration, for the reason that the Commonwealth depends largely on the testimony of these two witnesses, and the alleged confessions of these defendants to these witnesses, to connect the defendants with the perpetration of the crime. There is other evidence, but the testimony of these two witnesses is the main testimony on which the Commonwealth relies to directly connect these two defendants with the crime." In view of the facts to which we will call attention, this was error. The importance of oral testimony depends upon its truthfulness and primarily upon the character of the witnesses. Here Fox was himself under conviction of murder of the first degree, for having slain the same watchman, and according to his own testimony he was an accessory, both before and after the fact, to that crime, and, according to many incriminating circumstances, was the actual murderer. The watchman's pay envelope containing $42.53, his pocketbook, containing a lucky stone and a little prayer written by his own hand, were taken as loot, as were a revolver and flash light from the company's office, and the evidence tends to connect Fox with the possession of these articles. The following day he was spending

money lavishly, although out of work.  He pointed the
officers to the exact corner of the lumber pile where the
flash light was concealed, which is extraordinary unless
he saw it placed there, took them to his boarding house
on Twelfth Street and pointed to the hole in the attic
where Mauer's pocketbook with its contents was found,
told the officers to look in a certain davenport for the
revolver and it was there found.  Admittedly Fox was
not only upon the street but in the immediate neighbor-
hood of the plant when the murder was committed, and
returned to his room at a later hour.  Fox at the time
roomed with R. P. Brooks, near the scene of the crime
and his son, Andrew Brooks, testifies that shortly before
it was committed he was asked by Fox to join him in
robbing the Griswold plant and to do so the night of
March 10th.  As to that, young Brooks testifies: "Q.
State if you have ever had any conversation with Harry
Fox about committing a murder or robbery at the Gris-
wold plant?  A. Yes sir, I have.  Q. When was that that
you and he had this conversation?  A. It was on the
ninth and tenth too.  Q. Just give us the circumstances
of that conversation that you had with Harry Fox.  A.
On the ninth he suggested the matter, ninth of March.
So he asked me about it and I told him I didn't know,
so it was kind of late when he was asking me about it
and he gave me until the next day to study about it, so
he asked me again in the morning, about eleven or twelve
o'clock, somewhere near there, and I told him I yet
didn't know, so he asked me again later that evening,
between six.  Q. What did he say to you at that time?
A. He asked me what I was going to do, was I going to
go with him or not, and I told him no, I wasn't going.
So then he asked me if he could trust me.  I told him
yes.  So he told me if I would promise him I wouldn't
say anything about it to my daddy or no one of the boys
that lived there that he would do the job himself.  So
that is the last I know anything about it.  That is all
he had to say about it......Q. Did he ever mention to

you the names of the defendants Maxwell and Williams in regard to robbing the Griswold plant? A. No sir ......Q. You are sure now he said he was going to do it alone? A. Positively. He said he was going to do it alone." Fox, with some variations, including a denial of the threat to commit the crime alone, admits this conversation with Brooks, and places the date thereof after the alleged plot of March 2d, but earlier than the ninth. He also admits that after the robbery he paid Brooks five dollars of the stolen money, to remain silent. This is convincing evidence that the alleged plot of March 2d was an afterthought, for it would not require two separate bands of assassins to rob and murder one defenseless watchman. But for the admissions of Fox we might be slow to credit the statements of Andrew Brooks.

Fox's story in other respects is a strain upon credulity; for example, he states, in effect, that, at the hour of midnight, on March 10th, he stealthily entered the home of Maxwell, passed from room to room, found the beds of both defendants vacant, retraced his steps, walked down to the plant, a half mile away, and soon had his vigilance rewarded by seeing two forms approaching, who, as they came near, proved to be Williams and Maxwell and who said, as they hastily passed, "We have made the run." Fox's story of what occurred when he reached his boarding house that night at 1:30 a. m. is no better. He says he found the old man Brooks (Andrew's father) up, dressed and waiting for him (Fox) and that then and there, within one hour after the crime was committed, the old man told him of the murder, which was the first he had heard of it. Yet, as a matter of fact, the murder was not discovered until after six o'clock that morning, and, on the theory that Williams and Maxwell were its perpetrators, the old man would have had no possible knowledge of it when Fox came home. Again Fox is contradicted by a number of entirely disinterested and credible witnesses, called by the Commonwealth; for instance, up until ten days be-

fore the crime, he had been working at Griswold's for
nearly a year, but denies he had ever seen the revolver in
question, which, as above stated, was kept there in the
office, but Lynn Barber, stockkeeper at the plant, testi-
fies that Fox had seen the revolver and talked with him
about it, not over two months before leaving their em-
ploy. Fox gives as the reason for his ability to so readily
point out the hiding place of the flash light that there
was only one lumber pile in the yard, yet Officer Brown,
now sheriff, says: "Q. Was there more than one lumber
pile? A. Yes sir; there were several lumber piles there.
Q. Fox led you directly to this one? A. We went into
the lumber yard and I asked him which lumber pile it
was when we got in there. He pointed to the lumber
pile. We walked over to the lumber pile and I asked
him what part of the lumber pile the flash light was at
and he said 'Down there.'" Fox says when his state-
ment and that of Howard were read in the presence of
the defendants, at the police station on the night of their
arrest, the latter remained silent and even when the
district attorney repeatedly asked them if silence gave
consent, still remained silent, while Coroner Cardot,
who was present, says on that occasion the defendants
denied all knowledge of the crime. Fox says that in re-
tiring to his room at 1:30 a. m., the night of the murder,
he had a long conversation with R. P. Brooks, to which
we have referred, while the latter, a witness for defend-
ants, says he was in bed and, while he heard Fox come in,
he had no talk whatever with him. The evidence of Fox
is also contradicted by that of other witnesses.

There is the further circumstance that when first
arrested both he and Howard denied all knowledge of
the crime and were discharged. But the Griswold Com-
pany very properly offered a reward of five hundred dol-
lars for the arrest and conviction of the murderer or
murderers; thereupon Fox possibly thought he saw a
way to get money easier and safer than by the bludgeon,
and so laid this crime at the door of Williams and Max-

well, whose prosecution he avowedly instigated and openly and repeatedly swears he did it to get the reward. It is probable, however, that Fox was a better plotter than lawyer; for in admitting himself near enough to the crime to swear it upon the defendants, he became an accessory before the fact, and hence, under the statute, liable as a principal felon.

In that respect Howard may be more fortunate, but he is not in an enviable position. He had been an employee at Griswold's and yet swears that for eight days before the crime he concealed the diabolical plot to rob their plant and perhaps murder his former coemployees; also that for some days thereafter he concealed all knowledge of it. Moreover, he gave as his reason for not joining the plot the fact that he was a cripple and might not be able to run fast enough to make his escape. His whole story is highly improbable; so far as appears, he had never associated with either of the defendants in any prior transaction lawful or otherwise; just what use he would be to them as a confederate is not clear, nor why they should so abruptly and recklessly make such a proposal in his presence. And the story he tells of being at Maxwell's Saturday forenoon, March 12th, is very remarkable; that the defendants would wait two days to destroy Mauer's pay envelope, and divide the spoils, the work of a moment, and then just happen to do it in his presence and also just happen to then give Fox five dollars for Andrew Brooks, are strange coincidents, aside from the improbability that they would relate to him all the details of the crime. But if Fox was the real criminal and tried to get Andrew Brooks to join him in the crime and, failing, started out to do it alone and personally did it or helped to do it, and then hid the flash light on the premises, the whole theory of the March 2d plot falls and the testimony of neither Fox nor Howard is entitled to credit.

The first sentence in the paragraph of the charge above quoted, viz: "In addition to this testimony you have the

testimony of Albert Howard and the testimony of Harry Fox, and we would say to you that the testimony of these two witnesses is of the highest importance for your consideration, for the reason that the Commonwealth depends largely on the testimony of these two witnesses, and the alleged confessions of these defendants to these witnesses, to connect the defendants with the perpetration of the crime," was misleading. The evidence of Fox and Howard was conclusive against the defendants, if true, and the jury could not be expected to disbelieve it after the judge had emphatically instructed them that it was of the highest importance for their consideration. That the Commonwealth relied upon it for a conviction added nothing to its weight. The effect of this instruction was greater because of the absence from the charge of any suggestion as to the credibility of either Fox or Howard. The evidence of the former, a convicted murderer, a confessed accomplice, who swore he had inspired the prosecution of the defendant to secure the reward, was submitted to the jury as would have been the testimony of an entirely disinterested and reputable witness, with the affirmative suggestion that it was of the highest importance for their consideration. Of course, the evidence disclosed Fox's conviction and relation to the case, but the jury did not know how that affected his credibility, and the time-honored rule that the court should always caution the jury against the testimony of an accomplice, which Fox was and Howard came so near being, was unfortunately overlooked, as much the oversight of counsel as of the court.

The last sentence of the above quotation from the charge, viz: "There is other evidence, but the testimony of these two witnesses is the main testimony on which the Commonwealth relies to directly connect these two defendants with the crime," is misleading because inadvertently founded on a mistake of the facts; for, aside from the testimony of Fox and Howard, there is no evidence tending directly or indirectly to connect either of

the defendants with the crime.    The district attorney
calls our attention to some so-called "circumstances,"
none of which has the slightest value.    One is that on
the next morning (March 11th) an officer found the
tracks of two men leading out of one of the gates of
the Griswold plant, and another officer speaks of seeing the
tracks of two men leading in and out of the same gate;
but the officers made these observations sometime after
the shops were open and cannot tell whether the tracks
were fresh or old, or whether the footprints were of rob-
bers or others.    Furthermore, the defendants lived eight
blocks away and there is not the slightest thing tending
to connect either of them with the tracks.    Again, the
circumstances seem to indicate that Mauer's body was
taken up to the fifth floor on the elevator and then car-
ried by hand up another flight of stairs, at least there
were smears of blood upon the side wall of that stairway.
Three or four witnesses for the Commonwealth, includ-
ing the coroner, say the smears were about as high as
the shoulder of an ordinary man, but one police officer
says they were higher than his head.    Relying upon the
latter and ignoring the evidence of the other witnesses,
the district attorney strenuously urges, both in his
printed and oral argument, that this points to the guilt
of defendant, Williams, because he is a tall man; such
reasoning is faulty.    It is an inference that the body was
carried up those stairs, another that it was carried on a
man's shoulder, a third that thereby the blood smears
were made upon the wall, but admitting them all and
even that the one witness was right and the others wrong
as to the height of the smears, still it does not follow that
the body was borne on the shoulder of a tall man, as the
body carried would necessarily be higher than the shoul-
der.    Even the conclusion, which cannot be drawn, that
the criminal was a tall man, would be of no avail against
Williams as there are thousands of tall men in Erie.    The
suggestion, that if the body was carried up the stairs it
indicated the presence of more than one participant, is

untenable, for it is the Commonwealth's theory that it was carried on a man's shoulder, in fact a limp body could not well be carried on the shoulders of two men, while two would naturally carry it low in their hands; so the shoulder theory rather tends to indicate a one-man job. There is nothing impossible, or even improbable, in the theory that a man weighing one hundred and thirty-six pounds could carry a body weighing one hundred and seventy pounds up a flight of stairs; equal and even greater exhibitions of strength are often seen among common men. There is no physical reason why Fox may not have committed the crime alone; but, even if he had someone with him, there is no suggestion by him or by any one else that it was either of the defendants. Aside from the testimony of Fox and Howard there is no evidence that the defendants were near Griswold's plant that night or that either of them ever had or saw a cent of the stolen money or a particle of the stolen property, and there was not a bloodstain, finger-print, footprint, article of clothing or anything else to in any manner suggest the connection of either defendant with the crime. True, the stolen revolver was found in Maxwell's house, but it was found hidden in the davenport between the back and the seat where Fox had been sitting shortly before his arrest, and just where he directed the officers to look for it. So, while the rule stated by the trial judge as to the effect of the possession of stolen goods, as indicative of the possessor's guilt of the crime by which they were acquired, is perfectly sound, it has no application here as against the defendants, except as such possession is traced to them by the evidence of Fox or Howard.

The defendants have consistently and earnestly maintained their entire innocence from first to last and not by word or look has either betrayed the slightest evidence of guilt, although they have passed through some very remarkable experiences. For example, they were taken to the cemetery and separately locked in a vault with the

corpse of the murdered watchman and there cross-examined; not only was this done in the daytime but again at one o'clock at night, amidst a severe electric storm, where for a long time they were separately locked again with the corpse and, among other stratagems, commanded, by a voice ostensibly from heaven, to disclose who killed George Mauer, an ordeal to which they never should have been subjected; and the resourceful district attorney ascribes their passing unflinching through it to their familiarity with scenes of death and horror acquired while serving on foreign battlefields in the world war. The defendants also came unscathed through a most insinuating and merciless cross-examination.

Williams was rooming with Maxwell at the time of the murder and both testified that they were home, and retired that night at the usual hour and remained there until morning. This is corroborated by other members of the household, so far as naturally could be by those who sleep at night. The trial judge properly referred to this evidence, but neglected to explain the nature of an alibi; it is, however, so easily understood that the defendants were probably not prejudiced thereby, and, as they requested no more specific instructions, we will not reverse upon that ground. Some explanation, however, would have been proper, especially as two other features of the defense rest on a similar principle; the evidence for the defense is that Williams did not go to Maxwell's to room until March 7th, and that he worked all day on March 2d for J. B. Wright at Wesleyville, five miles away, and as to that he is corroborated by Mr. and Mrs. Wright; if so, Williams could not have been a participant in the plot at Maxwell's that afternoon. Again, Howard definitely fixes the time of his visit at Maxwell's when he claims he saw the destruction of the pay envelope, etc., as Saturday forenoon, March 12th, while Everett Beard, who worked and roomed with Howard, says they worked together all day Saturday at the dump; if

so, Howard could not have been at Maxwell's as he testifies. Beard also says he slept with Howard on Thursday night, thus tending to dispel any suspicion of the latter being present at the crime. It may not be improper to mention some other rather trifling matters, which came out during the trial, to wit, that Mr. and Mrs. Maxwell, on the night of March 10th, occupied the bedroom off the kitchen when theretofore they had slept in the bedroom off the living room; and that Williams lay down on his bed that evening with his clothes on, thus seeking to raise an inference that defendants were arranging so they could more easily make their exit and reëntrance. The reason for occupying another bed that night is explained by Mrs. Maxwell, and the fact of a man lying down on his own bed with his clothes on needs no explanation. Maxwell says his wife read to him of the murder from an extra paper about 10 o'clock that morning, while, as a reporter remembers, the extra edition did not come out until noon; but the matter is wholly unimportant, as the entire neighborhood knew of the murder by nine o'clock.

The coroner and two or three officers testify that, in answer to a question, Maxwell, while in the patrol wagon on the night of his arrest, said that on the evening of the murder he was at a pool room until about midnight. Maxwell says he had in mind the evening of the eleventh while on the evening of the tenth he was at a moving picture show and returned home about ten o'clock. The most truthful witness when suddenly asked where he was some evening last week might easily give a mistaken answer; but the matter is without significance, for the undisputed evidence is that Maxwell came home on the evening of the tenth, and it is the Commonwealth's theory that he and Williams went from there to commit the crime. There were a pair of overalls, a jumper and a cap, found in the Griswold yard the next morning, but there is nothing to connect them with either defendant.

We believe we have referred to everything that the Commonwealth could possibly suggest as creating the slightest suspicion against the defendants, except the testimony of Fox and Howard; and we say again that, aside from their testimony, there is not a particle of evidence in this record in any manner directly or indirectly tending to connect either defendant with the crime charged. The record is complicated and it is not surprising that the trial judge fell into the error complained of, but it calls for a reversal, more especially in view of the very suspicious evidence upon which the Commonwealth relies.

The sixth assignment of error is sustained and thereupon the judgments are reversed and a venire facias de novo awarded.