Commonwealth *v.* Bubna, Appellant.

52

Argued March 24, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John A. Blackmore,* for appellant.

*Damian J. McLaughlin,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 26, 1947:

This is an appeal of Mike Bubna from a conviction of murder in the first degree with the death penalty imposed. His sister, Mrs. Mildred Thomas, was at the same trial convicted of the same murder in the same degree, with life imprisonment imposed as punishment. The defendants did not demand separate trials.

Robert Fisher, aged 35 years, of Erie, Pa., was murdered on March 4, 1946. Two days afterwards his body, covered with leaves and some dirt, was found in a little ravine near the Erie Golf Club. An empty .25 caliber automatic pistol was found nearby. Fisher's nose was broken, his teeth knocked out, his eyes blackened, his body bruised, and all marks of identification had been removed from his clothing. A medical examination disclosed that he had five fatal bullets in his head. These three persons were charged with Fisher's murder: Mike Bubna, Mrs. Mildred Thomas, and Mike Dominic.

The last named was the Commonwealth's chief witness. He testified that a little before 7 P. M. on March 4, 1946, he went to the house of Mrs. Thomas at 1212 West 26th St., Erie, Pa., and found Bubna and Fisher there. Mrs. Thomas was in bed and in her bedroom he met Pauline Nasser, who was Mrs. Thomas' sister, and also Mrs. Nasser's husband, James. A girl by the name of Eleanor Tarbell, described as the "sweetheart of Mike Dominic" was also in the house. About 7:30 P. M. Fisher left; he returned about 9:15 P. M. or 9:30 P. M. There was an argument between Fisher and Bubna, each characterizing the other as being a "double-crosser"; the mutual charges were that each had appropriated the proceeds of one or more stolen cars. Fisher and Bubna and Stoynoff had, since the fall of 1945, been partners in the successfully executed criminal plan of stealing automobiles, taking them to Maine and there paying an excise tax, and with the tax receipt securing a Maine registration card and automobile license. They then took the cars to other states and disposed of them. Mrs.

Thomas participated in a minor way in the criminal enterprise and shared to a small degree in its profits.

After Fisher returned to Mrs. Thomas' home on the night of March 4th, he and Dominic did most of the drinking and Fisher reached "an advanced stage of intoxication". He "sat in a chair and rolled his head around." Mrs. Thomas then told Eleanor Tarbell to get a pair of shears as they were "going to play a joke on Robert Fisher." The shears were produced and Mrs. Thomas closely clipped some of Fisher's hair from the top and near the front of his head, saying as she did so, "We are going to make him the laughing stock of Erie." Mrs. Thomas then "went into the bathroom and got a razor and started shaving Bob Fisher's eyebrows." Dominic asked, "What are you doing that for?" Mrs. Thomas replied, "Because they won't identify him." Bubna said: "This will be an example for Stoynoff; I don't like double-crossers." Bubna then struck Fisher "a slap or a punch" in his face and called him a "double-crosser" and told Eleanor Tarbell to "get out of the kitchen" because "the whole thing was going to be messy." Mike Bubna took the razor from Mrs. Thomas and dragged Fisher out of the kitchen and down into the cellar. Dominic remained in the kitchen and consumed a few more drinks. A little later Bubna "hollered" to "Mike" to come down the cellar. Dominic did not do so. Bubna then called Dominic "in a furious manner" to come down. He went down and saw Bubna "kicking and punching" Robert Fisher. Bubna then took some white cloth hanging on a line in the cellar, wrapped it around the gun, and fired some shots. Dominic went upstairs and drank some more liquor. He said he saw while in the cellar "feet and a dark dress" and he "thought they belonged to Mildred Thomas." Mike Bubna called him downstairs again and when he went down he saw Mildred Thomas cutting Fisher's hair and letting it fall in a newspaper. This hair she destroyed. Bubna rolled Fisher over and the witness saw Mrs.

Thomas reach into his [Fisher's] back pocket, take out a wallet, look through it and then throw it into the furnace. She also removed Fisher's stockings. Dominic asked her what she was doing that for and she replied: "So you don't find any identifications." He said Mike Bubna then pointed the gun at him and asked him to "get rid of the body". He and Bubna then carried the body upstairs and put it in Bubna's car. Bubna then said: "Now you get rid of that." Mike Dominic drove to a point near the Erie Golf Club, dragged Fisher's body out of the car, covered it with leaves and mud and tossed the gun away. Two days later both the gun and the body were found by boys, who notified the State Police. This gun was identified by Lieutenant White-cotton, a ballistic expert, as the gun which discharged five bullets into Fisher's head. On the return journey the car got stuck in the mud and Dominic secured a ride into the city and informed Bubna of the situation. He and Bubna then returned to the car and enlisted the services of Carmen Pruvedenti. The latter was unable to extricate the car from the mud, and Bubna and Dominic then decided to engage an auto wrecker. Bubna returned home and Dominic got the Poplar Auto Wreckers and the latter were able to get the car out of the mud. Pruvedenti testified as to seeing Bubna with Dominic near the car which was stuck in the mud.

When Dominic returned to the Thomas home he was told by Bubna that "everything is cleaned up." Mrs. Thomas said to him: "You better change those clothes." The clothes were muddy. She later told him that she had taken the clothes down to the cellar and burned them. Mrs. Thomas and Dominic then went out and looked at the car. There was blood on both running boards and on Fisher's coat and jacket in the back seat. Mrs. Thomas said: "You better take it down to the cellar and burn it." Mrs. Thomas also advised him to wash the car. She and Eleanor Tarbell handed him the hose. Mrs. Thomas said: "Better make up a story that we all stayed

in this house and never left it." Bubna gave Dominic thirty dollars and some clothes and he [Dominic] and Miss Tarbell left for Florida. They were subsequently arrested in Savannah, Georgia.

Blanche Horst Fisher, the wife of the victim, who stated that at the time of the murder she "was not living" with her husband but was "on friendly terms with him", testified the last time she saw her husband was about 9 P. M., March 4, 1946, at her home at 133 West 8th St. He had come there at 8:15 P. M. and at that time "he had been drinking quite heavily". During the 45 minutes he passed at her home, he called Mike Bubna on the telephone and she heard him say, "There is nobody going to double-cross Fish. You told me that last car was wrecked. I know it wasn't. I want my money and I am coming up and get it." Fisher then called a taxicab driver and said "he was going to 1212 West 26th Street." Fisher then called Mike Bubna again and said: "Hello, Mike. I am going up in fifteen minutes and I am going to have two witnesses when I leave here that I am going up there and I am not afraid of you." Fisher left the house shortly after 9 o'clock. Before he left he said to his wife, "If I am not back within two hours call at 1212, find out where I am or else send my brother up when he comes home from work.

Despite Fisher's declaration as to his *not* being "afraid" of Bubna, it is obvious that he had apprehensions that something might happen to him after he met Bubna and that it might cause his disappearance. When Fisher did not return home, Mrs. Fisher carried out her husband's instructions and had his brother Warren Fisher go with one Jack O'Brien to the house at 1212 West 26th St. between 11 and 12 P. M. that night. When Warren Fisher finally got some response to his knocking at the door and asked about his brother's whereabouts, both Mike Bubna and Mrs. Thomas told him "they saw him [Fisher] that afternoon", the implication being that they had not seen him *since* that afternoon.

Bubna, in testifying in his own defense, admitted that he had seen Fisher at his sister's house about 8 P. M. on March 4th; that Fisher was conversing with Dominic and that Dominic then said that "he had to go down and find Stoynoff." He said: "The last time I ever saw Bob he was going to the front door and Dominic was going with him and he went to the front door with him." He was asked if Dominic went out with him. He said: "No, he didn't. He just went to the front door with him." He said that Dominic was called to the phone sometime after Fisher left and that after these telephone conversations Dominic asked Bubna if he could use Bubna's car. "He said he wanted to talk to Mrs. Horst and he had to take it to talk to a former girl friend of his." Dominic left the house in Bubna's car about an half or three-quarters of an hour after Fisher left.

Arthur Stoynoff testified in behalf of the Commonwealth that he conversed on the telephone with Bubna on March 3, 1946. Bubna said to him: "I hear you are doing business with Bob Fisher." He admitted that he, Mike Bubna and Mildred Thomas had been engaged in stealing automobiles for profit. The first car was stolen in the latter part of October or early part of November, 1945. It was stolen by Bubna and Stoynoff. The car was stolen in Erie, Pa., and sold in St. Louis, Missouri. Bubna and he split the profits after giving fifty dollars to Mildred Thomas who had driven their luggage to Albion, Michigan where it was transferred to the stolen car. They stole another car and sold it in Buffalo, New York, and Mrs. Thomas got $70 out of that transaction. Another stolen car was sold in Cincinnati, Ohio. Mrs. Thomas received no part of the profits from the sale of that car. Stoynoff said that on March 1, 1946, he met Bob Fisher and they "went out and stole a car in front of the Eagles Club" and they put it away at Cambridge Springs until they could go to Maine and have it registered. He was asked: "Did you tell Mike Bubna

that you and Fisher had stolen that car?" He answered: "No, I didn't." He was asked: "Where did you learn how you could register a car in Maine so that you could get a title for it and sell it?" He said: "From Mike Bubna." (Bubna in his testimony said that he had worked some time in the State of Maine).

Stoynoff when shown the gun with which the murder was committed said he obtained the gun from Mrs. Fisher in October 1945 and had taken it to the house where Mike Bubna and Mrs. Thomas were living. He secured some shells for the gun from Mike Bubna's brother Andy in Cleveland. He never afterwards took the gun from Bubna's home. He saw it there in the latter part of December; he had the gun in his hand at that time and Bubna took it out of his hand. When after his arrest Bubna was shown this gun by Corporal Mathias of the State Police, he denied that he even had seen the gun and said he knew nothing about it. Stoynoff was in Portland, Maine, at the time of the homicide.

Eleanor Tarbell testified that at noon on March 4th at Mrs. Thomas' home she heard Bubna and Mrs. Thomas talking about Arthur Stoynoff and Robert Fisher. Bubna said to Mrs. Thomas: "If Stoynoff and Fisher don't come through with what I want this afternoon, it is going to be too bad for them." When Miss Tarbell was asked how she happened to be in the house at that time she said: "I was working for Mrs. Thomas." She was in the house when Fisher came in, about 7 P. M. Fisher and Bubna "were arguing about a car, something concerning money over a car." Fisher went out and came back about 9:15 P. M. or 9:30 P. M., "pretty well intoxicated." Mrs. Thomas said that "they were going to play a joke on Bob Fisher" and asked Miss Tarbell to get the shears. She did so. Her testimony continued as follows: "At first she [Mildred Thomas] wasn't chopping it [the hair] off; she was cutting it like you would cut a teddy-bear haircut. She said: "We are going to make him the laughing stock of Erie." Bubna said:

"This will be an example for Stoynoff", and he also said he "didn't like double-crossers", and "he slapped Fisher in the face." Then Bubna turned around and looked at Miss Tarbell and said: "Get Eleanor out of the kitchen. She isn't used to anything like this, and it is going to be messy." He then called Eleanor into the bedroom. She said: "Later Mike Bubna came in the room." He said: "I wish you weren't in this house this evening because there's things going on around here I wouldn't want you implicated." She said: "I got up and I went over to the kitchen door and I tried the kitchen door and it didn't open. I didn't think much of it, because I thought whatever they were doing they didn't want me to know about it." She was asked: "Did you hear any noises of any kind from the kitchen?" She answered: "There was quite a bit of noise from the kitchen, chairs moving around and the talk. I didn't hear the conversation . . . it seemed like maybe five to ten minutes after he [Bubna] had gone down cellar . . ." She heard something "like a gun shot". She thought she heard three of such shots although she could not say exactly, it all happened so fast. They sounded very faint. Then Mrs. Thomas came in the bedroom. She sat on the bed and she seemed "like in a trance, or something" and later "she came over and sat on the bed," and said, "Well, anything that went on in this house tonight isn't to be repeated. If it ever comes up in court, or anything, we will all tell the same story. In case you don't tell the same story it will be too bad for you." She also referred to her attorney (naming him) and said he "could get her out of anything." The witness was asked, "When did you next see or hear Mike Dominic?" She answered: "When he came back after Mike Bubna." She thought it was about a half hour to an hour later. Bubna was also in the house when Warren Fisher and a friend, Jack O'Brien, came to inquire about Robert Fisher. Before Warren Fisher came to the house, the witness asked Mike Bubna where Mike Dominic had

gone. He said "on an errand for him." When Warren Fisher and his friend Jack O'Brien came in about 11:30 P. M., Fisher inquired about his brother. The witness was asked: "Did you notice anything unusual at the time Mike Bubna got up to walk to the door with Warren Fisher and his friend when they left?" She answered: "Yes, he had a butt of a gun sticking out of his pocket." She was shown the murder gun and was asked if she "ever saw that gun before." She answered yes she had seen that gun "in the kitchen drawer". About an hour after Warren Fisher left, Mike Dominic came back and he and Bubna went out. Bubna was gone for about an hour and when he came back he had mud on his pants and his shoes and he changed his clothes. Later Mike Dominic came back and said: "I have mud all over me." Mrs. Thomas said: "You've got to change your clothes." Mrs. Thomas then took a flashlight and went out of the house, saying she "had to look the car over." When she came back she said the car would have to be washed. The witness stated: "Mike Dominic said that he was going home, and Bubna said, 'Well, you are going to stay here all night, and that car has to be washed before morning.'" The witness went down the cellar with Mrs. Thomas and "helped her put the hose out the window," in order to wash the car. The witness said that Mrs. Thomas instructed her as to the story she "was supposed to tell." She was told to say that "Bob Fisher came there early in the evening, and she had this heart attack, and Mike Dominic left there and he came back and we all stayed there anyhow all evening long, the last time we seen Bob Fisher was early in the evening." Mrs. Thomas then said to the witness "that in a couple of weeks things around there weren't going to be so nice for her, she was going to sell her furniture and things and go out to California, her husband Carmen was out there, and people wouldn't think anything strange about it." The next day it was decided by Bubna and Mrs. Thomas that Miss Tarbell and Mike Dominic should take the

Bubna car and go to Florida. The witness stated: "We [Dominic and Miss Tarbell] were to sell the car and wire the money back to Mike Bubna or Millie. I was supposed to give Mike Dominic the money to come back on, and I was going to stay down there." Bubna gave Mike Dominic the keys and registration card. Mrs. Thomas said: "Hey, you kids will need that title." Mike Bubna said: "No, you don't need it, you can sell a car on a registration." The witness and Dominic left for Florida and were arrested in Savannah, Georgia.

Warren Fisher testified as to the fact of his going to Bubna's house late on the night of March 4th and inquiring about his brother and being informed by Bubna that he [Bubna] had seen Robert Fisher in the afternoon. He also testified that on March 5th he had a conversation in front of Bubna's house at 1212 West 26th St., concerning the whereabouts of his brother, Robert Fisher. He asked Bubna where his brother was and told him that he "was going to report to the police." Bubna said: "No, I wouldn't do that because if they found Bob it would cause an awful lot of trouble."

Jack O'Brien testified that at about 9 P. M., March 4, 1946, Robert Fisher was at the home of his wife, Blanche Horst Fisher, and he [Fisher] said "he was going to Mike's house" and that "if he wasn't back in two hours to have his brother, tell his brother to call at that house." O'Brien and Warren Fisher both talked to Mike Bubna about 11:30 P. M. that night. Bubna told them that he had seen Robert Fisher "in the afternoon."

Bubna's defense was that he met Fisher "at Hattie's restaurant next door" about supper time on March 4th and Fisher asked him if he had anything to eat in the house. He answered "sure" and invited Fisher to the house and Fisher "had some stew." Dominic was there also. He said that Mrs. Robert Fisher (who owned the house at 1220 West 26th St.) was upstairs collecting rent from a tenant on the third floor. Fisher left at 8 P. M. saying "he had to go down and find Stoynoff." A

little later Dominic talked to someone on the phone and he asked Bubna if he [Dominic] could use Bubna's car. He said "he wanted to talk to Mrs. Horst and he had to take it to talk to a former girl friend of his." He went up to the house in Bubna's car. This was about three-quarters of an hour after Robert Fisher had left. Bubna said he never saw Fisher after he left the house at 8 P. M. on March 4th.

Bubna testified that Warren Fisher and Jack O'Brien came to the house late in the evening and asked for Fisher's brother, Robert, and he [Bubna] told Warren Fisher "he had last seen Bob at 8 o'clock." Bubna went to bed and "some time later Eleanor Tarbell came up and rapped on the door and she said that Dominic had had some trouble with my car and he wanted to see me; he was downstairs." He went down and saw Dominic who "was muddy from head to foot." Dominic told Bubna that the car was stuck in the mud. Dominic left saying "he had some friends he could get to get the car out" for him. Bubna laid down on the couch "kind of worried about my car." The next day Dominic brought the car back and Bubna washed part of it. He said "the car was loaded with mud. He denied that he (1) gave Dominic his car keys and registration card and (2) asked him to take the car to Florida.[1]

---

[1] On Aug. 9, 1946, nearly 3 months after his conviction, Bubna made a statement in the presence of his attorney. This was later taken down stenographically, transcribed, and filed with the record of this case. He stated that Fisher was in Mrs. Thomas' house at about 9 P. M., March 4, 1946, that he [Fisher] was drunk and that Millie Thomas and Eleanor Tarbell were cutting his hair and that a little later Eleanor "started to shave Bob's eyebrows off" and Bubna said: "A joke's a joke but that is going too far." Fisher and Dominic "went out" and some time later Bubna said "to Millie and Eleanor": "I wonder where Dominic is with my car." Some time later Dominic reported that the car was stuck in the mud. He told Dominic to "get a wrecker." Bubna went to where the car was and he noticed that "the left running board was covered with blood, a spot about 2 feet long." Bubna returned home and "told Millie that . . . there was blood on the running board of the car and maybe

He testified that he had no quarrel with Fisher on the night of March 4, 1946, and that he was not engaged with Fisher or Stoynoff in the stolen car "racket". He stated that he worked for Fisher who operated a garage at 918 Parade St., Erie, Pa., that he never owned a gun and never had a .25 caliber gun in his possession.

In his defense, he called Pauline Nasser who testified that in the latter part of February she heard an argument between Fisher and his wife and that Mrs. Fisher said something about "knowing how to get rid of him".

An employee of Hattie's Cafe saw Fisher and Bubna there at 6:30 P. M. March 4th and said "they were very friendly". County Detective Coates testified to the ten tests made *un*successfully on March 18th in the cellar where the murder is alleged to have taken place and on the steps leading to the cellar. Virginia Lobaugh who, with her husband, resides on the third floor of the premises in the cellar of which Fisher's murder is alleged to have taken place testified that Mrs. Fisher (who owns that house) was at the Lobaugh apartment from 7:30 to 8:30 on March 4, 1946. Mrs. Lobaugh further testified that she [Mrs. Lobaugh] was home all that evening and "heard no noises or shots or washing or anything else in the back-yard". Three persons from Portland, Maine, testified to their acquaintance with Mike Bubna when he was employed in Portland by The Truck Leasing Cor-

something had happened to Fisher." Millie said: "I don't think Dominic would do anything to Bob." Later Dominic returned and told him "I had some trouble with Bob and had to rub him out . . . Bob and I got into a fight and I hit him with a brick . . . Fisher grabbed me and I shot the son of a bitch like a dog . . ." Bubna examined the car and found in it "particles of what looked like brains on the inside of the door glass, and on the left rear glass and on the windshield, and what looked like blood on the dash-board . . . and also specks of blood on the roof of the car and on the rear window." Bubna "took a rag and wiped the glass and the dashboard off". Bubna directed that Dominic had better get out of town and he "decided to let him have the car" to go to Florida. He gave Dominic the car keys and the registration card and thirty dollars. The affirmation of the judgment of the court below in this case is not based to any extent on these statements made after the trial.

poration in that city from 1941 to 1945 and that his reputation as a peaceful and law-abiding citizen was good.

There were three assignments of error. The first assignment of error is: "The learned Trial Court erred in not permitting each of the defendants, Mike Bubna, and his sister, Mildred Thomas, who were jointly tried, twenty challenges each."

The Act of March 31, 1860, P. L. 427, section 40, 19 PS 785, provides as follows: "In all cases in which two or more persons are jointly indicted for any offense, it shall be in the discretion of the court to try them jointly or severally, except that in cases of felonious homicide, the parties charged shall have the right to demand separate trials; and in all cases of joint trials, the accused shall have the right to the same number of peremptory challenges to which either would be entitled if separately tried, and no more."

After eleven jurors had been chosen, another prospective juror was called to the stand for examination on his voir dire and when the clerk indicated to Bubna's attorney, John A. Blackmore, that it was his turn to challenge, he replied: "We have no challenge", meaning thereby that he had exhausted his half of the 20 challenges. He was under the impression that each defendant was entitled to only 10 challenges. There was no demand for the exercise of the right of a peremptory challenge of the twelfth juror and consequently there is no ruling by the court and no exception. Therefore, it is not correct to say, as does the appellant's counsel, that "the court did not permit" each of the defendants to have 20 challenges. The situation was precisely as it would have been if in the trial of a case where the defendant knew he had the right of 20 challenges, his counsel failed to challenge another juror, after peremptorily challenging 19 jurors, in the mistaken belief that he had already exhausted his challenges. If in the supposed case he had attempted to exercise his twentieth

challenge and the court had denied him that right under the *court's* mistaken belief that he already had twenty challenges, the defendant would be in a position to claim a denial of a substantial right, but that is not the situation here. Assuming, but not deciding, whether or not in the instant case each defendant was entitled to 20 challenges, counsel for the defendant conducted the trial on the theory that his client was entitled to only ten challenges. This error, if it was an error, was counsel's and not the court's and it cannot be made the basis for a new trial.

In *Commonwealth v. Landberg,* 106 Pa. Superior Ct. 487, the Superior Court held that the motion for a new trial was properly overruled because it was not based on any exception taken during the trial. In that case President Judge Trexler said: "He made no complaint and asked for no exception." That the defendants did not claim more than 20 peremptory challenges in this case is further indicated by the fact that in appellant's brief he states: "It was more or less agreed that the statute limited the challenges for the two defendants to twenty (20)."

If the defendants were each entitled to 20 challenges, their failure to exercise all their rights of challenge was due entirely to their counsels' error and such error is no ground for a new trial. There is nothing in this record to indicate that defendants were prejudiced by their failure to exercise a twenty-first peremptory challenge on the last of the 12 jurors accepted or that they desired so to challenge that juror.

The second assignment of error is based on the refusal of the court to permit Roy Hackenberg to testify that while at his home he had heard pistol shots on the night of the killing of Robert Fisher at sometime after midnight. His home is eighty-five one-hundredths of a mile from 1212 West 26th St. The court rejected this testimony as too remote. Even if Fisher had been driven by the alternative route suggested by the appellant's

counsel, in order to reach the place where Fisher's body was discovered he would never have been nearer than one-half mile to the home of Hackenberg. We see no materiality or relevancy in the fact that Hackenberg heard pistol shots at the time stated. Not only are pistol shots often heard but there are many other noises which sound like pistol shots, for instance, the backfiring of an automobile. It was testified by Lieutenant White-cotten, State Police Ballistic Expert, that a .25 caliber automatic pistol, such as was used in this case, would make a noise similar to the cracking of a whip. The court properly excluded this testimony.

The third assignment of error relates to the charge of the court on the subject of the amount of credibility to be given to the testimony of an accomplice to the crime. The court said: "When an accomplice of an ac-cessory testifies you should view that testimony with close scrutiny, especially with respect to any part where it is uncorroborated . . . It is not necessary that you discard it. It is not proper that you should, but the circumstances surrounding that testimony or of any testimony, for that matter, must be taken into considera-tion by you in arriving at the credibility that you are to give it and the reliance that you will place upon it."

While it is the better practice for a trial judge to explain to a jury *why* the testimony of an accomplice should be considered with "close scrutiny", i.e., care-fully and critically, it is reasonable to believe that the average juror possesses sufficient intelligence to under-stand without specific instructions why the testimony of an accomplice is to be viewed with some suspicion and why it is not to be accepted unless it carries with it a clear conviction of its truthfulness. It is a matter of general knowledge that partners in crime are likely when apprehended to cast the chief blame on each other. It is also equally well known that partners in crime sometimes do tell the truth as to the commission of the crime. The administration of justice in criminal cases

would be seriously handicapped if there was any rule that the testimony of an accomplice could not be received, or that it alone would never be sufficient to justify a conviction.

In *Commonwealth v. Elliott*, 292 Pa. 16, this court declared that: ". . . there is no rule of law in this State which forbids a conviction on the uncorroborated testimony of an accomplice: Com. v. DeMais, 234 Pa. 570, 572; Cox v. Com., 125 Pa. 94, 103, 104; Carroll v. Com., 84 Pa. 107, 118, 126; Com. v. Viscosky, 83 Pa. Superior Ct. 96, 103; Com. v. Lord, 81 Pa. Superior Ct. 279, 280; Com. v. Sayars, 21 Pa. Superior Ct. 75, 80; Com. v. Craig, 19 Pa. Superior Ct. 81, 94 . . . While the law permits a conviction on the testimony of an accomplice, yet it looks with disfavor on this character of proof, and, because the source of such evidence is corrupt, it is usual and correct practice to admonish jurors not to rely upon it unless corroborated: Kilrow v. Com. 89 Pa. 480, 488; Ettinger v. Com., supra, 344-345. The extent of the admonishment is a matter within the discretion of the trial judge, but the fact that such a warning is usual has given rise to the expression that it is a 'time-honored rule' that the court shall caution jurors against convicting upon the testimony of an uncorroborated accomplice (Com. v. Williams, 275 Pa. 58, 65), particularly when such testimony goes to the identification of the person accused: Watson v. Com., 95 Pa. 418, 424; Com. v. Polise, 81 Pa. Superior Ct. 69, 71. We said, however, in Cox v. Com., 125 Pa. 94, 103, 104, that it is 'for the trial judge, who . . . heard the witness [in question], noticed his manner and appearance upon the stand and can judge equally well with the jury as to his credibility, to say whether he is satisfied with the verdict', and that 'if both the jury and the [trial] court are satisfied' the alleged accomplice was truthful in the material parts of his testimony, 'there is no [good] reason why the verdict should not stand.' "

No request was made by defendant's counsel for further instructions on the subject of the credibility to be accorded to the testimony of an accomplice nor was any exception taken to that part of the court's charge. See *Com. v. Meleskie,* 278 Pa. 383, 123 A. 310. We find no such inadequacy in the instruction of the court on this subject as to constitute reversible error. All three assignments of error are overruled.

A reading of the record of this case convinces us that the appellant, Mike Bubna, had a fair trial and the credibility of the evidence offered against him was for the jury. The judgment is affirmed and the record is remitted to the court below so that the sentence imposed may be carried out.