459 A.2d 322

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Paul TANN, Appellant.**

Supreme Court of Pennsylvania.

Argued March 11, 1983.

Decided April 27, 1983.

Claudia C. Sharon, Sharon & Sharon, Pittsburgh, for appellant.

Robert L. Eberhardt, Deputy Dist. Atty., Kemal Alexander Mericli, Asst. Dist. Atty., Pittsburgh, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

LARSEN, Justice.

In the early morning hours of January 28, 1979, an angry racial confrontation developed between two groups of young males in the Beltzhoover section of the City of Pittsburgh. The charged incident quickly deteriorated into deadly violence as gunfire cracked in the cold snowy night [1] and James Fink, one of the white youths involved, was shot and killed.[2] The Appellant, Paul Tann, a young black man, was charged in the slaying.

[1] Apparently, at least two of the black youths were armed with guns and several of the whites had clubs and sticks.

[2] It eventually was determined that the victim was felled by a 30 caliber rifle bullet.

After a trial by jury, Tann was convicted of third degree murder, possession of an instrument of crime, and recklessly endangering another person. Post-trial motions were filed and denied and the appellant was sentenced to serve a term of imprisonment of ten to twenty years.[3] A direct appeal to this Court followed.[4]

■ First, the appellant challenges the trial court's denial of his motion to suppress a rifle and scope seized by the authorities at the time of his arrest. Tann argues that the rifle and scope were seized in violation of rights guaranteed him by the Fourth Amendment to the United States Constitution.[5] In reviewing the suppression court's ruling in this case we will limit our consideration to the evidence of the Commonwealth and the uncontradicted evidence of the appellant. *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976).

The record establishes the following:

On January 29, 1979, armed with an arrest warrant and acting upon information received from one Joseph Patterson, another young man charged in the incident, Pittsburgh police officers went to a house on Climax Street. Patterson had described the approximate location of the dwelling as being located at a certain specific intersection on Climax Street. No address was supplied. In addition the police had

3. Appellant was sentenced to 2½ to 5 years imprisonment for his conviction for possession of an instrument of a crime. This sentence to run concurrently with the 10 to 20 years sentence. On the conviction for recklessly endangering another person, sentence was suspended.

4. Tann appealed from the Judgment of Sentence in the murder conviction directly to this court. Appeals from the sentences in the other convictions were properly filed in the Superior Court and then certified to this Court.

5. "The right of the people to be secure in the persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. *United States Constitution, Fourth Amendment.*

information that the fatal weapon was a 30 caliber rifle with a scope attached.

Upon arrival at the designated intersection, the officers first went to 99 Climax Street. A female who answered the door told the inquiring policemen that she did not know Tann and did not know of his whereabouts. After visiting three other houses at the intersection and the home of Tann's parents a few blocks away without results, the officers called back to the Station House to re-check the location with Patterson. They were told to go to the first house they had visited. On their second visit to 99 Climax Street the officers were admitted to the premises by one of the occupants, Karen Timbers.[6] After initially denying that the appellant was on the premises, Karen Timbers stated that Tann was present in the house and he had a gun. She directed the police officers to a first-floor bedroom situated right off the kitchen where she said he was hiding. The officers went to the doorway of the bedroom pointed out by Karen Timbers and ordered the appellant to exit. Following a period of silence of approximately 2 or 3 minutes, Tann came out with his hands raised. At this point the appellant was turned toward a wall and handcuffed. One of the arresting officers took two steps into the dark room from which Tann had just emerged and found, on the floor directly in his path of entry, a rolled-up rug with a rifle protruding from the left side. He also observed a scope resting on the floor a very short distance from the rifle.[7] Both the rifle and scope were seized and tests established that the rifle was the one used to fire the bullet which killed James Fink.

By appropriate motion the appellant sought to suppress the introduction into evidence of the seized rifle and scope. The suppression court refused appellant's motion and held

6. Karen Timbers and her three young children, ages 2, 4 and 6 lived on the first floor. Leah Whitehead, Karen Timber's sister, and her one child lived on the second floor.

7. Testimony indicated that even though the room was dark these items could be seen by the light which shined through the doorway from the kitchen.

the items to be admissable [8] citing *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) where the United States Supreme Court stated:

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence."

Further, the lower court ruled that Tann "Did not have any expectation of privacy in the bedroom of a house he did not occupy." [9] We agree with both conclusions.

■ The police officers were voluntarily admitted into the house by Karen Timbers, one of the occupants, and they were directed to the specific room where the appellant was at the time. Once the appellant had made his delayed exit from the dark bedroom the officers had a right, for their own protection, to look into the room from whence he came.[10] They had been informed by Karen Timbers that Tann was in possession of a gun.

■ The rifle and scope lay in plain view of the officer who looked into the bedroom by taking two steps across the threshold.[11] The seizure of the rifle and scope was not the result of an unlawful search. *See: Commonwealth v. Lassiter,* 457 Pa. 582, 321 A.2d 902 (1974).

■ The primary aim of the Fourth Amendment is to protect people from unreasonable intrusions of legitimate

**8.** The lower court opinion speaks only of the rifle, however, the same considerations are equally applicable to the scope.

**9.** Trial Court Opinion, page 3.

**10.** A police officer may conduct a search of an arrested person and the area within his immediate control because of the always present danger in an arrest situation that the arrestee may seek to use a weapon or to conceal or destroy evidence. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1971). *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

**11.** When Karen Timbers admitted the police officers into the house and directed them to the exact room where Tann was hiding with a gun, this constituted adequate permission for the officers to enter that room.

expectations of privacy. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). It is only legitimate expectations of privacy which are protected by the constitution. There must be more than a mere subjective desire for privacy; it must be an expectation which society recognizes as reasonable. *Rakas v. Illinois, supra,* 99 S.Ct. at 430–31, n. 12, citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–517, 19 L.Ed.2d 576 (1967).

■ The appellant had no possessory or proprietary interest in the premises where he was arrested and the rifle and scope seized. The first floor of the house was occupied by Karen Timbers and her three children and the second floor by Leah Whitehead (Karen Timber's sister) and her child. The appellant was a friend of both females and he occasionally made social visits to their home. He was not an over-night or live-in guest and he did not use any part of the house for any purpose. On the day of his arrest he only had been in the house for 10 to 15 minutes previously. Under the circumstance of this case we find that appellant had no expectation of privacy in the premises of his friend Karen Timbers.

Next, appellant argues that he was denied effective assistance of counsel in the trial of his case in that counsel failed to object to the admission of certain irrelevant and prejudicial testimony of attorneys representing two Commonwealth witnesses.

In appraising the appellant's claim of ineffective assistance of counsel, we are governed by the well settled standard pronounced in *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967):

"We cannot emphasize strongly enough, however, that our inquiry ceases and counsel's assistance is deemed effective once we are able to conclude that the particular course chosen by counsel had *some reasonable basis* designed to effectuate his client's interests. The test is *not*

whether other alternatives were more reasonable, employing a hind sight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis." 427 Pa. at 604–05, 235 A.2d at 352 [emphasis in original] *Commonwealth v. Leonard,* 499 Pa. 357, 453 A.2d 587 (1982); *Commonwealth v. Sherard,* 483 Pa. 183, 394 A.2d 971 (1978).

■ At the outset of our inquiry into the question of the ineffective assistance of counsel, we must determine whether there is arguable merit to the matter which it is claimed trial counsel failed to pursue. *Commonwealth v. Sherard, supra,* 483 Pa. at 191, 394 A.2d at 975; *Commonwealth v. Hubbard,* 472 Pa. 259, 278, 372 A.2d 687, 696 (1977).

During the course of the presentation of the Commonwealth's case, the District Attorney called as witnesses to the homicide, Joseph Patterson and Keith Hill. Both Patterson and Hill were present at the scene of the shooting on the morning in question, and Patterson had certain charges pending against him arising out of the incident.[12] Patterson and Hill were the only witnesses who could place the defendant at the scene with a rifle in his hands. Through their respective attorneys, these two key witnesses had negotiated a plea bargain with the District Attorney's office and the police authorities. Of course, part of the bargain was that each would testify against the appellant Tann in this case.

Prior to the Commonwealth calling Patterson and Hill to testify as agreed, the District Attorney called David Greenberg, Esquire, attorney for Joseph Patterson, and Michael Zurat, Esquire, attorney for Keith Hill, to give testimony. David Greenberg was called first and defense counsel asked for a sidebar wherein the Commonwealth made an offer of proof. The court and defendant's counsel were informed

12. It appears that Patterson was charged with a violation of the Uniform Firearms Act and recklessly endangering another person. At the time of his testimony, no charges had been brought against Hill, however, there was testimony that he could have been charged with a Firearms Act violation involving a pellet gun in a separate incident.

that Attorney Greenberg would testify that he represented Patterson; that Patterson was charged in the incident; that Patterson had not been tried as yet; that he advised Patterson concerning his Fifth Amendment rights to remain silent; that Patterson willingly waived his rights against self-incrimination; and the existence and terms of the plea bargain offer involving Patterson. Upon hearing the offer of proof defense counsel said "fine" and the witness took the stand.

Attorney Greenberg testified as the Commonwealth's attorney represented he would. On direct examinations he was asked to relate to the court his conception of Fifth Amendment rights and whether he advised his client Patterson in this regard. Mr. Greenberg responded as follows:

"Just briefly, my understanding would be that Mr. Patterson, as every defendant, has a right to remain silent and not say anything that may incriminate him. He was advised of that and elected to waive those rights and recount what his version of what happened."

Attorney Greenberg was further questioned and testified, in part, as follows:

Q. I as District Attorney could not force him then to testify or to make a statement should he choose not to do so, is that correct?

A. That's true, and he has been advised of that.

Q. In your relationship as his attorney, you have discussed that entire matter with him and you're relating to this court and jury that he, with your advice, is willing to waive those rights and to testify here today, is that correct?

A. He is.

Q. And indeed he is present and it's our understanding that he is to be called as a witness, is that correct?

A. He understands that; that's correct.

Q. Now also in that conncection, let me ask a further question. Do you have any conception whatsoever, any problem whatsoever with that waiver, that is, his

waiving his fifth amendment rights being knowing and voluntary on his part?

A. No, I believe he fully understands he has a right to remain silent and has voluntarily agreed to waive those rights.

Q. Now, secondly, has Mr. Patterson and you as his attorney have any knowledge of any plea bargain, deal, representation, promise, or anything else of that sort made to him in return for having him come here and waive his fifth amendment rights and testify?

A. I have knowledge of such discussions.

Immediately following attorney Greenberg's testimony, Joseph Patterson took the witness stand and gave damaging testimony against the defendant.

There was no side bar or offer of proof prior to the testimony of Michael Zurat, Esquire, however his evidence, as that of Attorney Greenberg, was calculated to bolster and enhance the credibility of his client-witness, Keith Hill.[13] Attorney Zurat testified, in part, as follows:

Q. And there is an agreement between you and your client on the one hand and representatives of the police and the District Attorney's office on the other hand in connection with his testimony?

A. There is an agreement. Basically, the agreement is that in exchange for his testimony, to testify to what he saw on the night in question and *telling the truth,* there will be no charges of any kind, of any nature brought against him in regard to that incident or any subsequent activity that occurred. [Emphasis ours]

Viewing the testimony given by Attorneys Greenberg and Zurat as a whole, we find such to be absolutely irrelevant and highly objectionable. Focusing on the thrust of

**13.** Both Greenberg and Zurat told the jury that their respective clients, Patterson and Hill, had no prior criminal record. This gratuitous, irrelevant testimony only could have been offered to elevate, in advance, the credibility of Patterson and Hill as witnesses for the prosecution, and to induce the jury to draw an unfavorable inference as to the appellant's prior record.

their testimony, we find it to be eminently prejudicial. None of the evidence presented through Messers. Greenberg and Zurat has any rational probative value to the issue of appellant Tann's guilt. The repeated references to the Fifth Amendment and the right not to say anything which would be self-incriminating deprived the appellant of a fair trial.

In cases where the Commonwealth is informed of a witness' intention to assert a privilege against self-incrimination, we have held that it is reversible error to call that witness to the stand where it is likely that the jury will associate the witness with the defendant and the criminal episode giving rise to the charges against the accused. *Commonwealth v. Davenport,* 453 Pa. 235, 308 A.2d 85 (1973); *Commonwealth v. DuVal,* 453 Pa. 205, 307 A.2d 229 (1973). In *Commonwealth v. Greene,* 445 Pa. 228, 285 A.2d 865 (1971) we stated that:

> "[T]he principal that the jury may not draw any inferences from a witness' exercise of his constitutional rights whether the inference be favorable to the prosecution or the defense [mandates] that a witness should not be placed on the stand for the purpose of having him exercise his privilege before the jury."

We believe the same prohibition pertains where the Commonwealth seeks to call to the attention of the jury the fact that a witness, who is associated with the accused in the activity giving rise to the criminal charges,[14] has waived his Fifth Amendment rights against self-incrimination and is taking the witness stand to *tell the truth.* This tactic has the effect of emphasizing to the jury that the defendant, who is associated with the witness, has the same opportunity to waive his constitutional rights and tell the truth. The defendant is unduly prejudiced by this blantant invitation for the jury to draw an inference from the fact that the witness is foregoing his constitutional right against self-incrimination. This tends to spotlight the accused if he fails

14. This would include a witness who the jury is likely to associate with the accused and the incident involved in the criminal charges.

to do the same thing and clearly invites an improper prejudicial inference from the jury.

In the present case, the Commonwealth's use of this unwarranted tactic could only steer the jury to infer that since its witnesses, Patterson and Hill, waived their Fifth Amendment rights and *willingly* gave self-incriminating testimony, Patterson and Hill's testimony was the truth and entirely believable. Added to this is circumstance of the appellant Tann not taking the witness stand and failing to offer any testimony in his own defense. This invited the inference that, if he had testified and had told the truth, his testimony would have confirmed his guilt. It was entirely improper for the Commonwealth to invite such prejudicial inferences in the manner employed here.

It is evident from the record that the objection trial counsel failed to make to the testimony of Attorneys Greenberg and Zurat is of arguable merit. Further, the course chosen by trial counsel to stand by and permit this highly prejudicial and irrelevant testimony to be admitted without objection could have no reasonable basis designed to effectuate appellant's interest. *Commonwealth ex rel. Washington v. Maroney, supra.* Accordingly, we find that, in this regard, counsel was ineffective and appellant is entitled to a new trial.[15]

Reversed and remanded for proceedings consistent with this Opinion.

ROBERTS, C.J., filed a concurring opinion in which NIX, J., joins.

ROBERTS, Chief Justice, concurring.

I agree that appellant is entitled to a new trial on the ground that trial counsel provided ineffective assistance by failing to object to the testimony of the attorneys of wit-

15. Because of the disposition we make of the claim of ineffective assistance of counsel regarding the failure to object to the testimony of Attorneys Greenberg and Zurat, we do not reach the issue raised by the ineffective assistance claim regarding the failure to produce and present a qualified expert witness.

nesses for the Commonwealth regarding their clients' waivers of the privilege against self incrimination. However, in rejecting appellant's suppression claim, the majority unnecessarily holds that the challenged evidence was lawfully seized as having been in plain view. Appellant had no legitimate expectation of privacy in the home where he was arrested, and thus the search in no respect violated, or could have violated, appellant's Fourth Amendment right to be free from unreasonable searches and seizures. See *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Commonwealth v. Stanley,* 498 Pa. 326, 339, 446 A.2d 583, 589 (1982) (Roberts, J., joined by Flaherty, J., concurring).

NIX, J., joins in this concurring opinion.