581 A.2d 147

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Robert BRICKER, Appellant.**

Supreme Court of Pennsylvania.

Argued March 6, 1990.

Decided Sept. 21, 1990.

John Elash, Pittsburgh, Pa., for appellant.

Robert E. Colville, Dist. Atty., Claire C. Capristo, Deputy Dist. Atty., Christopher Conrad, Sandra Preuhs, Asst. Dist. Attys., Pittsburgh, Pa., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

Robert Bricker was sentenced to death for his role in the conspiracy to murder Thomas Sacco. The sentence is reversed and the case remanded for a new trial.[1] Our disposition of this case is necessitated by the fact that the trial court committed two errors, either of which would require reversal. The trial court improperly refused appellant's request that the jury be instructed to review Charles Kellington's testimony as coming from a corrupt and polluted source, and further erred in allowing the plea agreements of Charles Kellington and Charles Rossi to be sent out with the jury during their deliberations.

Appellant Bricker was originally charged by information filed on July 17, 1981, and the case proceeded to jury trial on November 11, 1981. The jury returned a verdict of first degree murder and appellant was sentenced to death. Upon appellant's direct appeal to this Court the judgment of sentence was reversed and the case was remanded for a new trial. *Commonwealth v. Bricker*, 506 Pa. 571, 487 A.2d 346 (1985) (plurality decision).

On remand, as indicated above, a jury once again convicted appellant of first degree murder and imposed the death sentence. Post trial motions were filed and denied and the case is again before this Court on direct appeal.[2]

█ In each case in which the death penalty is imposed, this Court is required to conduct an independent review of

1. The dissenting opinion correctly notes that todays' decision by the majority will require that Robert Bricker be tried a third time for the murder of Thomas Sacco. A majority of this Court believes that a third trial is necessary, because Robert Bricker has yet to receive a *fair trial* as required by the Pennsylvania Constitution and the minimum standards of due process.

2. See, 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b).

the sufficiency of the evidence, even where the defendant has not challenged the conviction on that ground. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt. *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986).

■ Appellant is guilty of murder of the first degree if he was an accomplice of another who intentionally killed Thomas Sacco.

18 Pa.C.S. § 306 provides, in pertinent part:

(a) General rule. A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

(b) Conduct of another. A person is legally accountable for the conduct of another person when:

(3) he is an accomplice of such other person in the commission of the offense.

(c) Accomplice defined. A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it....

18 Pa.C.S. § 2502(a) provides that "a criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."

The Commonwealth's principal evidence in this case was the testimony of one Charles Kellington, who testified pursuant to a plea agreement and as a participant in the

federal witness protection program. Kellington's testimony was quite lengthy and very detailed regarding the circumstances which led to the death of Thomas Sacco, the victim herein. According to Kellington, the murder was the culmination of a conspiracy orchestrated among William "Eggy" Prosdocimo, Miles Gabler and appellant.

To set the stage for the events surrounding the actual killing, Kellington gave the jury certain background information about the relationship of Sacco and himself to the conspirators in order to establish a motive for the murder. Kellington told of his own lengthy relationship as a distributor for Eggy Prosdocimo, a man who made his living as a drug dealer, specializing in the illicit sale and distribution throughout Pittsburgh of dilaudid. Sacco, whom Kellington had known all his life, also worked for Prosdocimo as a distributor of drugs. Kellington testified that he had only met the appellant a few months before the murder. Kellington believed that appellant was also involved in distributing drugs for Prosdocimo.

The relationship between Sacco and Prosdocimo began to deteriorate over the issue of money. Sacco was in debt to Prosdocimo in excess of $4,000 for drugs Sacco was to have sold on consignment. As their business relationship soured, the personal animosity between the two men escalated. A series of events involving name-calling and threats to each other of personal violence erupted. During one of these incidents shortly before the murder, Prosdocimo offered Kellington $1,500 to "mess up" Sacco. The final act by Sacco, precipitating Prosdocimo's desire to eliminate him, was Sacco's threat to give information about Prosdocimo's drug network to a particular Pittsburgh police narcotics detective.

Two weeks before the murder, appellant introduced Kellington to the last member of the conspiracy, Miles Gabler. At appellant's request, Kellington agreed to house Gabler, who had just escaped from prison, in his apartment. According to Kellington, it was appellant who suggested to Prosdocimo the idea of using Gabler to murder Sacco.

Several days before the murder a meeting took place in Kellington's apartment. Present were Gabler, Prosdocimo, Kellington and appellant. The object of the meeting was to discuss the best method and location for killing Sacco. Alternate scenarios were devised.

At some time prior to this meeting, appellant had provided Kellington with a .357 magnum which Kellington kept at his apartment. During the discussion of how to kill Sacco, Kellington told appellant where he kept the weapon and how many bullets were presently in the gun. The murder weapon was never recovered, but the bullets that killed Sacco were the same caliber as those that Kellington stated he knew were in the gun when it was handed to Gabler.

An initial plan was reached to attempt to "hit" Sacco that evening, as they believed he would be at the Red Door night club in Pittsburgh. After appellant and Prosdocimo left the apartment, Gabler expressed doubts to Kellington about actually having to kill Sacco. Kellington advised him that if he did not want to kill Sacco, he could just shoot him in the leg and pretend that he had tried to kill him. Kellington arrived at the Red Door later that evening and learned that this first attempt had failed.

A few days later Thomas Sacco was fatally shot while standing on the sidewalk in front of an after hours club frequented by all the players in this particular crime network. Kellington arrived at the club, known as Butchie's, prior to the shooting. As he approached the entrance he saw appellant sitting in a car in front of the club. Appellant asked him if he would be around that evening. When Kellington responded affirmatively, appellant said, "I might need you."

Upon entering the club, Kellington noticed that Sacco was present. According to Kellington, appellant had lured Sacco to this location by offering to sell him drugs. While Kellington was talking on the telephone, he observed Sacco and two other men go outside. Immediately thereafter, Kellington heard what sounded like a firecracker. Kellington emerged from the club and saw Sacco lying on the

ground. He bent over the body and ascertained that Sacco was still alive, but quickly went back into the club as the police approached.

As Sacco was taken from the scene in an ambulance, Kellington received a phone call at the club from appellant who asked if Sacco was dead. Learning that Sacco was not dead, appellant instructed Kellington to obtain further information and then meet him in Hazelewood at another club known as the Chasmar. Shortly thereafter, Kellington discovered that Sacco was dead and proceeded to the Chasmar lounge where he met appellant, Prosdocimo and Gabler.

The four men met alone in a back room with the gun allegedly used in the murder on the table before them. Kellington told the others that Sacco's last words were "no Bobby no," which angered appellant.[3] After discussing the murder, appellant and Prosdocimo left to dispose of the gun and Kellington took Gabler back to his apartment.

Kellington's testimony was bolstered by Charles Rossi, a federal prisoner serving time in the federal prisoner-witness protection program, who also testified pursuant to a plea agreement. Rossi testified that he had known appellant for fifteen years prior to the shooting and that over a six month period appellant told him two or three times that a man named Gabler had killed Sacco and that appellant was going to kill Gabler when it was all over. Appellant also indicated to Rossi that appellant had been paid for the killing. Appellant presented no witnesses at trial, but put on five character witnesses during the penalty phase of the case.

The evidence establishes that appellant aided others in planning and committing an intentional killing. The evidence, therefore, is sufficient to establish that appellant is guilty of first degree murder.

In his brief and argument before this court appellant has raised numerous allegations of error. As indicted above the

3. There is no dispute that Miles Gabler actually fired the fatal shot. Only Thomas Sacco knows what prompted his final words.

conviction must be reversed on the basis of two reversible errors committed by the trial court. Our opinion will be limited to a discussion of the two issues upon which we reverse judgment, the remaining issues raised by appellant will not be addressed.

## THE JURY INSTRUCTIONS

■ The most egregious of the two errors was the failure of the trial court to give the jury the appropriate "corrupt source charge," so-called, regarding the testimony of Charles Kellington.[4] The trial court refused the requested corrupt source charge [5] and instead gave the "false in

**4.** Although the appellant alleges that the corrupt source charge should also have been given with respect to Commonwealth witness Charles Rossi the record does not establish sufficient evidence that Rossi was an accomplice. We therefore treat this assertion as addressed only to Charles Kellington.

**5.** The corrupt source charge as requested by the appellant is set forth in the standard Pennsylvania Jury Instructions (Criminal), where it is recommended for use in cases where it appears that a Commonwealth witness is an accomplice. *See, Commonwealth v. Bubna,* 357 Pa. 51, 53 A.2d 104 (1947). It provides in pertinent part:

(1) Some special rules may apply to your consideration of Kellington's testimony concerning the defendant's commission of the crime charged in this case.

(2) First, you must decide whether or not Kellington himself joined with someone else in committing the crime with which the defendant is charged. Although Kellington did not admit his own involvement, other evidence could support a contrary conclusion. So, after considering all the evidence you have heard, you must first decide whether or not Kellington himself participated as an accomplice in the commission of the crime.

(3) An accomplice is one who knowingly and voluntarily cooperates or aids another in committing a crime. He is not merely a passive bystander who happens to observe an illegal act and does not participate in it. Nor is he someone who sees a crime being committed and fails to report it to the police. Instead, an. accomplice is someone who, knowingly, voluntarily and purposely joins with someone else in performing an illegal act.

(4) If, after reviewing all the evidence, you conclude that Kellington did not participate in the crime, then in considering his testimony you need not be guided by any special rules. But if, after reviewing all the evidence, you conclude that Kellington did participate in the crime as an accomplice, then in considering his testimony you should be guided by certain principles which apply specially to his testimony.

The special rules are as follows:

one false in all" charge.[6] The Commonwealth now asserts that Kellington was not an accomplice, and even if the evidence would support an inference that he was an accomplice, failure to give the corrupt source charge was harmless error.

Initially we must review the evidence to determine if it *permits* an inference that Charles Kellington was an accomplice.[7] We review the evidence in the light most favorable to the Commonwealth as the verdict winner below. *Commonwealth v. Burton*, 450 Pa. 532, 301 A.2d 599 (1973).

The testimony of Charles Kellington was the major piece of evidence linking appellant to the murder of Thomas

(1) Experience shows that after being caught in the commission of a crime a person may falsely blame others because of some corrupt and wicked motive. On the other hand, such a person may tell the truth about how he and others committed the crime together. (2) In deciding whether or not to believe the accomplice, you should be guided by the following principles which apply specially to his testimony:

*First,* the testimony of an accomplice should be looked upon with disfavor because it comes from a corrupt and polluted source. *Second,* You should examine the accomplice's testimony closely and accept it only with caution and care.

*Third,* You should consider whether the accomplice's testimony that the defendant committed the crime is supported, in whole or in part, by evidence other than that testimony, for if it is supported by independent evidence it is more dependable.

*Fourth,* You may find the defendant guilty based on the accomplice's testimony alone even though it is not supported by any independent evidence.

(3) And so, to summarize, even though you decide Kellington is an accomplice, his testimony standing alone is sufficient evidence on which to find the defendant guilty, if, after following the foregoing principles, you are convinced beyond a reasonable doubt that Kellington testified truthfully that *the defendant committed the crime.*

6. The so-called "false in one false in all" charge as given by the trial court is as follows:

Also, in this case, if you decide that a witness deliberately testified falsely about a material point—that is about a matter which could effect the outcome of this trial, you may, for that reason alone, choose to disbelieve the rest of his testimony, but you are not *required to do so. You should consider not only deliberate false-hood,* but also all other factors bearing on the witness' credibility in deciding whether or not to believe other parts of his testimony.

7. An accomplice is defined in 18 Pa.C.S.A. § 306 the pertinent parts of which were set forth previously in this opinion.

Sacco. It is this testimony which provides the essential facts from which we must decide if an inference can be drawn that Kellington himself was an accomplice.[8]

As Kellington unfolded the sordid details of this particular conspiracy he revealed his own involvement in the events leading to Thomas Sacco's death. Kellington knew of the plot to kill Sacco from its inception. Kellington was present at the crucial meeting discussing alternate locations and methods to commit the crime. Only Kellington's testimony suggests that the gun given to Gabler in his apartment was the actual murder weapon.[9] Kellington housed Gabler, the trigger man, before and after the shooting. Kellington was present at the scene and stayed to obtain additional information for appellant after the shooting. Kellington attended the post-murder meeting and drove the trigger man home.

Equally clear from his testimony is the fact that Kellington falls within none of the exceptions to the definition of an accomplice as set forth in 18 Pa.C.S.A. § 306(f).[10] At no time did he attempt to prevent the crime, alert the police or warn the intended victim; nor did he terminate his involve-

**8.** We have intentionally limited our review of Kellington's testimony to only that portion elicited on direct examination.

**9.** The murder weapon was never recovered, however, Kellington testified that .38 calibre bullets were in the .357 magnum revolver when it was given to Gabler. It was a .38 calibre bullet which caused Sacco's death.

**10.** The section provides as follows:

(f) exceptions.—Unless otherwise provided by this title or by the law defining the offense, a person is not an accomplice in an offense committed by another person if:

(1) he is a victim of that offense;

(2) the offense is so defined that his conduct is inevitably incident to its commission; or

(3) he terminates his complicity prior to the commission of the offense and;

(i) wholly deprives it off effectiveness in the commission of the offense; or

(ii) gives timely warning to the law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense.

ment in the activity at hand prior to the commission of the crime.

Further support for the possibility that Kellington was an accomplice can be gleaned from the plea agreement that was negotiated in exchange for his testimony in this case. At paragraph five (5) of the agreement it states as follows:

5. As a further condition of this plea agreement, Charles Patrick Kellington will enter pleas of guilty to murder in the third degree and/or conspiracy to commit murder in connection with the deaths of *Thomas Sacco* and "Stretch" DeStefano filed by the District Attorney of Allegheny County, or the Attorney General of the Commonwealth of Pennsylvania or such other duly authorized law enforcement authority, if, in the opinion of the said officials, said charges are warranted, based on the facts and the law.

The prosecuting authorities in this case must have believed that Kellington was an accomplice in the Sacco murder. No other justification exists for the insertion of paragraph five in the plea agreement.

Although not evidence, statements the Assistant District Attorney made to the jury at trial certainly reflect the supposition that Kellington was an accomplice, or at least would be viewed as such by the jury. Anticipating the jury's probable reaction to the witnesses he would present, the Assistant District Attorney forewarned them about the unsavory characters they would encounter during the trial. He acknowledged the difficult task of finding "men of the cloth and real nice people" who could testify about a murder committed in furtherance of a drug network. He conceded that testimony about the events surrounding Thomas Sacco's death could only come from people within that network.

Introducing the jury to the name "Charles Kellington," the prosecutor stated: "He [Kellington] didn't just all of a sudden see the light and see the right way because, you know, he was part of and a good friend of Prosdocimo and his circle of friends. *Charles Kellington, in 1979, was*

*right in the middle of it. ... Charles Kellington was part of that inner circle."* In his summation the prosecutor again referred to Kellington's pivotal role in this conspiracy to commit murder; "[if] Tommy Sacco gets burned for snitching on the drug operation, who is going to go and tell on Tommy Sacco or Sacco's killing? It's not going to happen, and it wouldn't have been Charles Kellington either.[11] *The only person that it's going to come from is going to be someone from that circle."*

Kellington's testimony alone is sufficient to create the inference that he was an accomplice in the conspiracy to murder Thomas Sacco. The prosecutor's statements and the actual verbiage of the plea agreement add considerable support to this conclusion.

It was in the companion cases of *Commonwealth v. Thomas,* 479 Pa. 34, 387 A.2d 820 (1978) and *Commonwealth v. Upshur,* 488 Pa. 27, 410 A.2d 810 (1980), that this Court unquestionably found reversible error where the trial court denied the defendant's request for a corrupt source charge. The facts of those cases were identical. Thomas and Upshur were codefendants, tried separately for the murder of Alvin Smultkis. They were also members of an organization known as the Black Brothers, Inc. (BBI). An acknowledged purpose of the BBI was the commission of criminal acts by individual members, with the profits to be shared within the organization. To that end, the BBI possessed various weapons freely used among the members.

Two of the members of BBI testified against Thomas and Upshur; revealing their knowledge of the murder after the fact, the purpose of the BBI and the fact that the gun used was property of the BBI. Because of the conspiratorial nature of the BBI, this court held that those witnesses, even without actual knowledge of the specific criminal act involved, were accomplices. Reversing the conviction for

11. The inference here being that Kellington would not be testifying absent the plea agreement.

the trial court's failure to give the requested corrupt source charge we held:

> The rationale behind instructing a jury that it should view the testimony of an accomplice with suspicion when the accomplice testifies for the prosecution, lies in the recognition that such a witness, out of a reasonable expectation of leniency, has an interest in inculpating others. For an accomplice charge to be required, the facts need not *require* the inference that the witness was in fact an accomplice, they need only permit such an inference. If the evidence is sufficient to present a jury question with respect to whether the prosecution's witness was an accomplice, the defendant is entitled to an instruction as to the weight to be given to that witness's testimony. *Thomas, supra.* Pa. at 37, A.2d at 822. [emphasis added]

Looking at the facts of this case in light of our decisions in *Thomas* and *Upshur,* appellant was entitled to a corrupt source charge regarding Kellington's testimony.

■ We now turn to the Commonwealth's allegation that even if the evidence permitted an inference that Kellington was an accomplice, the trial court's failure to give the corrupt source charge was harmless error. The standard by which this Court must consider claims of harmless error was succinctly enunciated by Mr. Justice Roberts: "an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless." *Commonwealth v. Story,* 476 Pa. 391, 409, 383 A.2d 155, 164 (1978). The Commonwealth has the burden of proving that the error was harmless *beyond a reasonable doubt. Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536, 538 (1990).

The Commonwealth here asserts that the error was harmless because the "false in one, false in all" charge as given coupled with the cross examination of Kellington and the closing argument of appellant's attorney was sufficient to

alert the jury to scrutinize Kellington's testimony carefully. This assertion is specious.

It is an axiomatic principle of our jurisprudence that the trial judge has the sole responsibility for instructing the jury on the law as it pertains to the case before them. "The function of elucidating the relevant legal principles belongs to the judge, and the failure to fulfill this function deprives the defendant of a fair trial." *Commonwealth v. Bishop,* 472 Pa. 485, 490, 372 A.2d 794, 796 (1977). The function of cross-examination, which derives from the constitutional right of confrontation, "is to provide an accused with an effective means of challenging the evidence against him by testing the recollection and probing the conscience of an adverse witness." *Commonwealth v. Ritchie,* 509 Pa. 357, 364, 502 A.2d 148, 152 (1985); *aff'd in part, rev'd in part,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The function of a closing argument is to provide counsel "the opportunity to marshall the evidence and to present it, along with the permissible inferences arising therefrom, to the jury in the best possible light on behalf of his client, and to attempt to explain away the evidence which is unfavorable." *Commonwealth v. Gwaltney,* 479 Pa. 88, 93, 387 A.2d 848, 850 (1978).

The duty of instructing the jury as to the law which is to be applied during their deliberations cannot be delegated to or usurped by a litigant involved in the trial of the case. Regardless of how effective appellant's attorney may have been in representing his client, the judge carries the sole responsibility for instructing the jury. In this case the primary evidence against appellant was the testimony of Kellington. Therefore, "it cannot be assumed beyond a reasonable doubt" that the failure of the trial court to give the corrupt source charge "did not contribute to the verdict." *Story, supra,* 476 Pa. at 409, 383 A.2d at 164. The Commonwealth has failed to meet its burden that the error was harmless.

## THE PLEA AGREEMENTS

■ The second error committed by the trial court concerns the plea agreements pursuant to which Charles Kellington and Charles Rossi testified in this case. The actual documents setting forth the terms and conditions of the deals reached between various Governmental authorities and Rossi and Kellington were improperly sent out with the jury during their deliberations.

In the plea agreement entered into among Rossi, the United States of America and the Commonwealth of Pennsylvania, Rossi agreed, *inter alia*, to "provide complete and truthful information to ... the Commonwealth of Pennsylvania ... and testify ... as required." Rossi also agreed therein to "provide complete and truthful information concerning any and all illegal activities in which [he] participated." Additionally, Rossi agreed to provide "complete and truthful information" about the deaths of Gary DeStefano and Thomas Sacco, among others. The agreement also stated that "if at any time it is determined ... that Rossi ... has not provided complete and truthful information as called for in this agreement ... or has at any time knowingly made a false statement under oath in connection with the terms of this agreement, [he] will be subjecting himself to a prosecution for perjury...." Kellington entered into a plea agreement of virtually identical language.

The documents which formalized these two agreements were then signed by the United States Attorney for the Western District of Pennsylvania, the District Attorney of Allegheny County, the Attorney General for the Commonwealth of Pennsylvania, Rossi and Kellington respectively, and the Attorneys who individually represented Rossi and Kellington at the time. The signatories to these agreements, by executing the documents, placed the imprimatur of their offices as support for the proposition that Rossi and Kellington were *telling the truth*.

It is beyond question that permitting the prosecution to send these documents out with the jury during deliberations impermissibly bolstered the credibility of Charles Rossi and

Charles Kellington. In so bolstering their credibility, the court violated the defendant's right to a fair trial.

This Court had occasion to deal with a related issue in *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983).

In *Tann*, the defendant was convicted of third degree murder for his part in the violent racial confrontation which ended with the death of James Fink. Two of the witnesses that testified against Tann did so pursuant to plea agreements that they entered into with the prosecution; obtaining leniency for their parts in the violence in exchange for their testimony against Tann. The attorneys representing each of those witnesses took the stand and testified that their clients had agreed to waive their Fifth Amendment rights against self-incrimination and to "tell the truth" in this case in exchange for their pleas.

In reversing Tann's conviction, Mr. Justice Larsen, writing for the majority, held that the Commonwealth could not:

call to the attention of the jury the fact that a witness, who is associated with the accused in the activity giving rise to the criminal charges, [footnote omitted] has waived his Fifth Amendment rights against self-incrimination and is taking the witness stand to *tell the truth*. This tactic has the effect of emphasizing to the jury that the defendant, who is associated with the witness, has the same opportunity to waive his constitutional rights and tell the truth. The defendant is unduly prejudiced by this blantant[sic] invitation for the jury to draw an inference from the fact that the witness is foregoing his constitutional right against self-incrimination. This tends to spotlight the accused if he fails to do the same thing and clearly invites an improper prejudicial inference from the jury. *id.* at 603, 459 A.2d at 328 (emphasis in original).

In the case *sub judice*, the introduction of the plea agreements served as silent witnesses, causing the same prejudice to appellant as we held to be reversible error in the case of Paul Tann. With the agreements before them, the jurors could reasonably infer that appellant had the same opportunity as Rossi and Kellington to cooperate with

the investigation of Thomas Sacco's death, and chose to remain silent. The fact that appellant did not take the stand in his own defense further bolsters his claim that there is a reasonable possibility that this error might have contributed to the verdict. *Story, supra.*

The Commonwealth argues that the plea agreements had to be revealed to the jury; and had they not been revealed the Commonwealth would now be attacked for misconduct. This argument avoids the real issue. It would have been appropriate for the Commonwealth to reveal the existence of the agreements, and the parameters thereof, through the testimony of the witnesses. If they still felt it necessary to enter the documents into evidence they simply could have redacted portions of the agreements to delete the prejudicial aspects, as requested by defense counsel, prior to submission of them to the jury. To allow the jurors to read these unredacted documents at their leisure during deliberations runs afoul of the *Tann* case and the requirements of fundamental fairness.

The prosecutor's closing argument in this case highlights the danger of permitting the jury to review these unredacted agreements. In his argument, the prosecutor stated that it would be difficult to find "men of the cloth and real nice people" to testify about the events in question. In fact, pursuant to the prosecutor's direct examination, Rossi and Kellington admitted to committing acts of extreme violence, extortion, theft, drug crimes on a grand scale, and murder. It is unquestionable that these two witnesses were members of the most vile and corrupt elements of our society. Yet by admitting into evidence these agreements that vouch for their credibility, the government was testifying *sub silentio* that *"just this once"* these lowlife witnesses should be believed; that *"during this trial"* they are crowned with the governmental halo of "being on the right side" and are therefore credible. The jury neither cautioned to "look upon the testimony with disfavor" nor to realize that the witnesses may "falsely blame others because of some corrupt and wicked motive", were persuaded

to believe that the witnesses were telling the truth because the government's own documents said so. This impermissible vouching for witnesses—especially witnesses of this caliber—offends our sense of decency and our notion of the fundamental fairness inherent in our judicial system.

■ The Commonwealth correctly asserts that the decision to send these documents out with the jury was a question to be left to the discretion of the trial judge, and absent an abuse of discretion, that decision cannot be overturned. Pa.R.Crim.P. 1114. However, as succinctly stated by our Superior Court in the recent decision of *Commonwealth v. Kubiac*, 379 Pa.Super. 402, 550 A.2d 219 (1988), *alloc. denied* 522 Pa. 611, 563 A.2d 496 (1989); "[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record." Considering the clear prejudicial impact of these documents upon the appellant's right to a fair trial, we hold that the trial judge exercised his discretion in a "manifestly unreasonable" manner by allowing the documents to go out with the jury. Although the issue of harmless error was not raised in this context, our review of this matter leads to the inescapable conclusion that the substance of these agreements was such that it cannot be assumed they had no effect on the jury's verdict. The decision to admit these documents into evidence and permit them to go out with the jury, standing alone, would require reversal of this conviction. When this tactic was coupled with the failure of the trial court to provide the appropriate "corrupt source charge," the prejudicial effect on the appellant's right to a fair trial was overwhelming.[12]

For the reasons set forth above the judgment of sentence is *reversed* and the case *remanded* for a new trial.

FLAHERTY, J., files a dissenting opinion, in which NIX, C.J., and McDERMOTT, J., join.

**12.** We reiterate that the corrupt source charge should only have been given regarding Kellington's testimony.

FLAHERTY, Justice, dissenting.

Mr. Justice Cappy has written for the majority that Robert Bricker is entitled to a third trial for murder. I strongly dissent.

The majority's primary reason for granting a new trial is that the trial court erroneously failed to give an instruction that Kellington was an accomplice. I do not believe that the accomplice instruction was required.[1]

---

1. The Standard Pennsylvania Jury Instructions (Criminal), although not binding, suggest the following jury instruction, in pertinent part, for cases in which there is a dispute as to whether the Commonwealth witness is an accomplice:

(1) Some special rules may apply to your consideration of [Kellington's] testimony concerning the defendant's commission of the crime charged in this case.

(2) First, you must decide whether or not [Kellington] himself joined with someone else in committing the crime with which the defendant is charged. Although [Kellington] did not admit his own involvement, other evidence could support a contrary conclusion. So, after considering all the evidence you have heard, you must first decide whether or not [Kellington] himself participated as an accomplice in the commission of the crime.

(3) An accomplice is one who knowingly and voluntarily cooperates or aids another in committing a crime. He is not merely a passive bystander who happens to observe an illegal act and does not participate in it. Nor is he someone who sees a crime being committed and fails to report it to the police. Instead, an accomplice is someone who, knowingly, voluntarily and purposely joins with someone else in performing an illegal act.

(4) If, after reviewing all the evidence, you conclude that [Kellington] did not participate in the crime, then in considering his testimony you need not be guided by any special rules. But if, after reviewing all the evidence, you conclude that [Kellington] did participate in the crime as an accomplice, then in considering his testimony you should be guided by certain principles which apply specially to his testimony.

The special rules are as follows:

(1) Experience shows that after being caught in the commission of a crime a person may falsely blame others because of some corrupt and wicked motive. On the other hand, such a person may tell the truth about how he and others committed the crime together.

(2) In deciding whether or not to believe the accomplice, you should be guided by the following principles which apply specially to his testimony:

*First,* the testimony of an accomplice should be looked upon with disfavor because it comes from a corrupt and polluted source.

*Second,* You should examine the accomplice's testimony closely and accept it only with caution and care.

Normally, the Commonwealth, as the verdict winner, would be entitled to the inference in its favor that Kellington was not an accomplice. However, in *Commonwealth v. Thomas*, 479 Pa. 34, 387 A.2d 820 (1978), this Court stated:

The rationale behind instructing a jury that it should view the testimony of an accomplice with suspicion when the accomplice testifies for the prosecution, lies in the recognition that such a witness, out of a reasonable expectation of leniency, has an interest in inculpating others. *For an accomplice charge to be required, the facts need not require the inference that the witness was in fact an accomplice, they need only permit such an inference.* If the evidence is sufficient to present a jury question with respect to whether the prosecution's witness was an accomplice, the defendant is entitled to an instruction as to the weight to be given to that witness's testimony.

479 Pa. at 37, 387 A.2d at 822 (emphasis added) (citations omitted). The first question we must resolve, then, is whether the facts *permit* an inference that Kellington was an accomplice.

*Third,* You should consider whether the accomplice's testimony that the defendant committed the crime is supported, in whole or in part, by evidence other than that testimony, for if it is supported by independent evidence it is more dependable.

*Fourth,* You may find the defendant guilty based on the accomplice's testimony alone and even though it is not supported by any independent evidence.

(3) And so, to summarize, even though you decide [Kellington] is an accomplice, his testimony standing alone is sufficient evidence on which to find the defendant guilty, if, after following the foregoing principles, you are convinced beyond a reasonable doubt that Kellington testified truthfully that the defendant committed the crime.

Std.Pa.J.Instr. (Criminal) § 4.02–4.03 (May 1972 Rev).

An accomplice is defined by 18 Pa.C.S. § 306 as follows:

(c) Accomplice defined. A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

. . . .

(ii) aids or agrees or attempts to aid such other person in planning or committing it.

The majority would permit the inference of Kellington's involvement in the conspiracy to murder Sacco because he knew of the plot to murder Sacco; he was present at a the meeting at which Bricker, Prosdocimo and Gabler discussed alternate locations and methods; the gun stored at Kellington's house was, according to Kellington, the murder weapon; Kellington housed Gabler before and after the shooting; and Kellington attended a post-murder meeting and drove Gabler home.

It is elementary, however, that knowing of a plot does not necessarily implicate one in the plot; that walking in on a meeting, by accident, as was testified, does not make one a participant in the meeting; that storing a gun in one's home for someone else does not, per se, implicate one in a crime which a third person subsequently commits with that gun; that housing a person, even one who subsequently commits murder, does not, without more, implicate the host in murder; and that attending the post-murder meeting and driving the murderer home does not fall within the definition of "accomplice." [2]

While the evidence indicates that Kellington walked in on a meeting at which Sacco's murder was being discussed, it does not indicate that Kellington was a part of that discussion. Nor is there evidence that he participated in any other phase of the planning of Sacco's death. At the meeting in his apartment, Kellington told Bricker where Bricker's gun was stored, but he did not give the gun to Bricker or to anyone else. Furthermore, there is nothing of record to indicate that this particular gun was the murder weapon. As to providing housing for Gabler, that, in itself, is not a criminal act. Finally, any acts which Kellington performed *after the shooting* would not be relevant to the

---

**2.** An accomplice is defined by 18 Pa.C.S. § 306 as follows:

    (c) Accomplice defined. A person is an accomplice of another person in the commission of an offense if:

        (1) with the intent of promoting or facilitating the commission of the offense, he:

        . . . .

        (ii) aids or agrees or attempts to aid such other person in planning or committing it.

question of whether he was an accomplice. I conclude, therefore, that Kellington was not an accomplice.[3]

But even if I were to determine that the evidence permitted an inference that Kellington was an accomplice, I would still conclude that the accomplice instruction was not required. As this Court stated in *Thomas*, the reason for the accomplice instruction is to caution the jury that the accomplice may testify to inculpate others in order to advance his own interests. In other words, because of the accomplice's own criminal liability, he may be lying. In this case, defense counsel began his cross-examination as follows:

DEFENSE COUNSEL. Okay, Mr. Kellington, you would agree with me that during the period of 1978 through 1979, you were a professional liar?

KELLINGTON. Yeah, I lied a lot; yes.

. . . .

DEFENSE COUNSEL. Isn't it true that you were making your living by lying in 1978 and 1979 as far as ripping people off with drugs?

KELLINGTON. Well, I lied about paying them; yes.

DEFENSE COUNSEL. Isn't it true that you lied to a priest and sold him phoney bonds?

KELLINGTON. I didn't do it. I was involved in it.

DEFENSE COUNSEL. Now, as far as—as far as your history, it is true, is it not, that you started off running numbers, as far as your criminal history? You ran numbers?

KELLINGTON. Yes sir.

**3.** As to the majority's reliance on comments made by the district attorney and on paragraph 5 of the plea agreement to bolster its contention that Kellington was an accomplice, little need be said. The prosecutor merely stated that Kellington was an unsavory character and that he associated with criminals. That does not make him an accomplice in any particular crime. As to the plea agreement, what the prosecuting authorities believed when they entered the plea agreement with Kellington is not evidence in the case. The agreement speaks for itself, and it indicates nothing more than the possibility that Kellington would be required to enter a plea in the Sacco case "*if, in the opinion of the said officials, said charges are warranted, based on the facts and the law.*"

DEFENSE COUNSEL. And you worked for Mr. Joe DeMarco?

KELLINGTON. Yes sir.

DEFENSE COUNSEL. And isn't it true Mr. DeMarco is a good friend of yours?

KELLINGTON. Yes sir.

DEFENSE COUNSEL. And while you were working for Mr. DeMarco, you were also dealing in heroin?

KELLINGTON. Yes sir.

DEFENSE COUNSEL. And you were also working as a—sort of like a strong armed body guard?

KELLINGTON. Collector. Yes.

DEFENSE COUNSEL. A collector; and in fact, you were collecting debts for Mr. DeMarco?

KELLINGTON. Yes sir.

DEFENSE COUNSEL. And that was with regard to his loan sharking operation?

KELLINGTON. Yeah, that and numbers.

DEFENSE COUNSEL. Okay, and you had, in fact,—you also had some dealing in beating up pimps for prostitutes.

KELLINGTON. For George Lee, yes.

. . . .

DEFENSE COUNSEL. And isn't it true that doing these collections and doing this protection work that you beat a lot of people up; is that correct?

KELLINGTON. Yes sir.

DEFENSE COUNSEL. And in fact, you have broken arms and ribs and things like that?

KELLINGTON. Sometimes.

DEFENSE COUNSEL. Sometimes? You've broken people's jaws and noses?

KELLINGTON. In fights. Yes.

DEFENSE COUNSEL. These are in—sometimes to collect from—on the loan sharking operation; is that right?

KELLINGTON. Sometimes.

DEFENSE COUNSEL. And while you were doing this, you would use a black jack or other weapons?

KELLINGTON. Sometimes.

DEFENSE COUNSEL. Okay. Now, you—you were involved in certain armed robberies, is that correct?

KELLINGTON. One.

. . . .

DEFENSE COUNSEL. And you were involved in some burglaries also?

KELLINGTON. Yeah, one or two.

DEFENSE COUNSEL. And during these—this time—and we'll talk about the time of—say from '75—1975 towards '79, you were heavy into the use of drugs, is that correct?

KELLINGTON. Yes sir.

N.T. 5/31/88, 69–73. In addition, defense counsel established that Kellington's life of crime, violence and lies culminated in at least one other homicide in which Kellington had been identified as the shooter, and that Kellington was at that time free because of the cooperation he provided in this case.

Although defense counsel requested the accomplice instruction, the trial court determined that the appropriate instruction, instead, was as follows:

Also, in this case, if you decide that a witness deliberately testified falsely about a material point—that is about a matter which could effect [sic] the outcome of this trial, you may, for that reason alone, choose to disbelieve the rest of his testimony, but you are not required to do so. You should consider not only deliberate falsehood, but also all other factors bearing on the witness' credibility in deciding whether or not to believe other parts of his testimony.

In closing, defense counsel, capitalizing on Kellington's testimony and knowing the instruction to be given, stated:

The selective memory of Mr. Kellington. He remembers things from 15, 20 years ago about beating up prostitutes and collecting money and threatening people and beating them up, but then he forgets that he had a

fight with Mr. Sacco. Forgets Mr. Sacco called him names. We learn that in cross-examination. He forgets that Sacco was saying things about the DeStefano homicide. He forgot that Sacco was—put the word out on the street about it. It didn't come out on direct examination. It came out through cross-examination. These are the things that Mr. Kellington—were pulled from Mr. Kellington. He forgot that he was I.D.'d as the trigger man in Florida; and then, I can remember one point that I think is very important, not only for what is said, but for how it was said. I can remember being here and asking him if he ever shot a deer in the Highland Park Zoo, and he—what did he say? Right. I submit to you he immediately said, "It wasn't me. That was a police officer that shot him, or some county detective or somebody. It wasn't me that shot him," so, although laboriously or maybe ineffectively, I was trying to go through transcripts, when he realized that I would finally get to the point where he had admitted that, he said, "I'll save you the time. I shot that deer. I shot the deer in Highland Park."

. . . .

This is the type of person that we're dealing with. He's lied. He's cheated his whole life. He's made his living—and a very good living out of lying and cheating. He made his life out of lying and cheating. He stood to gain freedom. He accomplished his goal. When the police were informed he had information on these unsolved homicides and he gave this information, I'm sure that they just finally and rightfully said, "Well, we have to go with it." They believed him. Obviously, somebody believed him, but the fact that he was believed at one point, does that, in any way imply that, in fact, what he's saying is truthful? It does not.

. . . .

Somehow, in some way, you must make a determination of this case based only on the testimony of Mr. Kellington and Mr. Rossi because they're the only people

that linked Mr. Bricker. Somehow, it must be implied that through this act of confession through getting up here and unabashedly saying, "I'm a liar," he therefore can now tell the truth that he's been born again to tell the truth now. "Because I admit to being a liar, therefore you have to believe me." I submit to you that anything that Mr. Kellington would say to you should raise a reasonable doubt in your mind.

Remember that a reasonable doubt is what would make a reasonably prudent person pause or hesitate before doing something of import in their life. I submit to you that anything that Mr. Kellington has said should make a reasonably prudent person pause or hesitate. You would not buy a used car from that man. Mr. Kellington is an admitted liar, and because he admits to being a liar, that doesn't grant him redemption where now he—now, because—I admit to all those bad things, so now I'm telling you the truth. It doesn't work that way. You still have to consider what he's saying. You still have to believe what he's saying. I submit to you, you cannot believe the word of Mr. Kellington.

The best con men, the best writers of fiction, the best people that are able to get over on other people, they mix truth and they mix fiction. They mix truth and reality. The truth of the matter was Tommy Sacco was killed. The fiction is that Mr. Bricker, in any way, had any involvement in it. The reality is that Mr. Kellington's arm was used. Mr. Kellington's gun was used. Mr. Kellington had the motive. Mr. Kellington was facing electrocution.

. . . .

I submit to you, Mr. Kellington creates a mythical background to [the] fact that Mr. Sacco was killed. The judge will instruct you, and he will tell you that there's another principle of law that you must consider, and that principle—it comes from the Latin, and what it is [falsus in uno, falsus in omnibus]. That means if you are false—if a witness takes a witness chair and testifies falsely on

one thing, he could be false on everything. The judge will instruct you that that is a rule of law and a rule that you can obviously take to heart. If you believe that Mr. Kellington has lied on one thing, you could disregard his whole testimony. You also have the right to say, "Oh, I don't believe Mr. Kellington on this, but I believe him on that." You can do that, but I submit to you it would be inconsistent with your oath.

. . . .

Please use your common sense. Judge testimony not only by what you hear but by how you hear it. Judge testimony by not only how somebody says something—or not only by what they say, but how they say it. Did Mr. Kellington ever make eye contact? Did he look believable? Did you get a visceral reaction of belief? That's how the judge will tell you have to determine credibility. Use the collective common sense that you have that has enabled each and every one of you to attain this age in life. Use that, abide by your oath, and we'll be completely satisfied. . . .

N.T. 6/1/88, 56–66.

It is apparent from reading portions of defense counsel's cross examination and summation together with the instruction from the court that the jury was well apprised of the danger inherent in Kellington's testimony. Further, the jury was well aware that it had the power to disbelieve some portion or all of what Kellington said and that it could totally disbelieve all of his testimony if it determined that he lied in a single instance. Finally, the jury was aware that Kellington had received favorable treatment with respect to other crimes in which he was involved because of his testimony in this case. In short, the jury was aware that Kellington was a criminal who had lied in the past, who might be lying in the present, and whose testimony was, therefore, suspect, and that they had the authority to disbelieve any or all of the testimony if they disbelieved any part of it.

This Court's requirement of an accomplice instruction in *Thomas* was never intended as a *per se* rule. Where, as here, the purposes of the *Thomas* rule have been achieved through vigorous cross examination and summation, the trial court's refusal to give the accomplice instruction was not error. Pennsylvania does not utilize jury charges which must be read verbatim. We do not rigidly enforce rote language, but rather examine the charge with relation to the record to see whether the jury is fairly apprised of the applicable law. In this case, even if Kellington were viewed as an accomplice, the jury was fairly warned of the pitfalls in believing the testimony of a witness such as Kellington, and the purpose enunciated in *Thomas* was accomplished. To hold otherwise would elevate form over substance, something this Court has repeatedly refused to do.

As a secondary reason to reverse the conviction and order a new trial, the majority has determined that it was error to permit the plea agreements of Kellington and Rossi to go out with the jury during deliberations. The majority reasons that because the plea agreements of Kellington and Rossi require them to tell the truth on pain of prosecution for perjury, and because the agreements are executed by the United States Attorney for the Western District of Pennsylvania, the District Attorney of Allegheny County, the Attorney General for the Commonwealth of Pennsylvania, as well as Rossi and Kellington and their attorneys, the government, *"by executing the documents,"* placed the guarantee of government on the truthfulness of the testimony of Kellington and Rossi. The majority concludes "beyond question" that the plea agreements in the hands of the jury bolstered the credibility of the state's witnesses to the extent that Bricker was denied a fair trial.

The short answer to this view is that it is absurd. The agreement merely implies that the Commonwealth believes its witnesses. That, presumably, is true in every case. If the Commonwealth did not believe its witnesses, it would not put them on to testify. And if it did put them on to testify and found that they made false statements or told

less than the whole truth, it would, presumably, prosecute them for perjury. This is true in every case, not just this one, and if it requires a reversal here, it should require a reversal in every case in which the Commonwealth puts on a witness and acts as if it believes him.

The majority's reliance on *Commonwealth v. Tann,* 500 Pa. 593, 459 A.2d 322 (1983), for the proposition that the plea agreements constitute improper buttressing of the veracity of Rossi and Kellington is misplaced. In *Tann* attorneys for two government witnesses took the stand and testified that their clients had voluntarily waived their right to remain silent and had entered into a plea bargain which required them to testify truthfully against the defendant in that case. This Court held that the testimony of these attorneys was irrelevant and objectionable in that "[n]one of the evidence presented through [the attorneys] has any rational probative value to the issue of appellant Tann's guilt." *Id.,* 500 Pa. at 603, 459 A.2d at 327. In this case there was no such testimony. The Commonwealth was required to reveal the existence of the plea agreements precisely because these agreements, far from bolstering the witnesses' credibility, raised doubts as to the likelihood of truthfulness emanating from the mouths of two such blatantly self-interested career criminals. The plea agreements did not, therefore, improperly bolster the testimony of government witnesses and they were not improperly admitted into evidence.

Rather than the agreements constituting a sub silentio testimony on the part of the government that "just this once" these untrustworthy criminal witnesses are to be believed, the effect of these agreements was to warn the jury, to remind them that they were dealing with criminals, and that the danger of their lies and deceitfulness was so extreme, even in this case, that the government stood ready to prosecute them for perjury, should it come to light that they lied. Far from endorsing these witnesses, the government's own document reveals the extent of its distrust. There was no error in the admission of these plea agree-

ments and the trial court did not abuse its discretion in allowing the jury to take the plea agreements with them. To hold that the court erred is to treat the jury as a group of medieval serfs who can be told about the plea agreement but who may not be shown the actual document for fear that they will be dazzled by gold seals and signatures on a paper submitted by the state.

The only abuse of discretion in this case is the majority's willingness to conjure up reasons to give a twice convicted murderer yet a third trial.

I dissent.

NIX, C.J., and McDERMOTT, J., join in this opinion.