## Commonwealth v. Robinson

C.P. of Delaware County, no. 92-2235.

*Albert A. Amoroso*, for the Commonwealth.
*Andrew J. Donaghy*, for the defendant.

SERENI, *J.*, November 1, 1994—

## I. PROCEDURAL HISTORY

The defendant in this matter, Jeffrey Robinson, was charged with knowing or intentional possession of a controlled substance, Information A, and possession of drug paraphernalia Information B. Prior to trial, defendant filed an omnibus pre-trial motion, comprised of a motion to suppress, with regard to an investigation conducted by the police. A hearing was conducted on October 19, 1993, at which time this·court denied the defendant's motion.

A one-day non-jury trial commenced and concluded on October 25, 1993, at which time the defendant was found guilty on both charges.

The defendant subsequently filed post-verdict motions, which motions were denied after oral arguments on January 25, 1994. At that time, Mr. Robinson was sentenced to two years county probation, one year on each count, to be served consecutively. The defendant thereafter appealed to the Superior Court.

## II. FACTUAL HISTORY

Mr. Robert Kane, an employee of Bell of Pennsylvania, was in the course of his duties on March 26, 1992 at approximately 2:30 a.m. At that time, he was delivering mail and company payroll checks to the Bell Telephone facility located at Morton and Pennington Avenues in Morton, Delaware County, Pennsylvania. (N.T. October 19, 1993, pp. 6-7.) When he approached the building, he noticed that the gate around the building was unlocked, which was very unusual. (N.T. October 19, 1993.) He proceeded into the building, which was unlit, and continued with his job. As he was exiting, he heard a noise coming from the ladies' restroom adjacent to the office in which Mr. Kane had been working. (N.T. October 19, 1993, p. 8.)

Mr. Kane opened the door to the ladies' room, which he found to be unlit. At that time, he saw the defendant who, when asked by Mr. Kane what he was doing there, answered that he belonged there. (N.T. October 19, 1993, pp. 9-10.)

Mr. Kane left and called his supervisor who advised him to go to the police station and/or call the police. Mr. Kane complied with those orders. (N.T. October 19, 1993, pp. 10-11.)

As a result of Mr. Kane's visit to the police station, Morton Borough police officer Joseph LaSpina met Mr. Kane and another officer (Officer White) at the Bell of Pennsylvania building. (N.T. October 19, 1993, p. 12.) The officers were granted entrance to the premises by Mr. Kane. (N.T. October 19, 1993, p. 26.) At Mr. Kane's direction, they proceeded to the ladies' room, which the police tried and found to be locked. (N.T. October 19, 1993, p. 12.)

[It must be noted that, according to the defendant himself, this "ladies' room" functioned as a restroom for women, but also served for the storage of various equipment. (N.T. October 19, 1993, p. 41.) As testified to by the defendant, "that bathroom is a supply room where every man in the garage has access to it at any time of the day." (N.T. January 25, 1994, p. 14.)]

Officer LaSpina knocked on the door to the ladies' room and identified himself as a police officer. (N.T. October 19, 1993, pp. 12, 21.) There was no response for approximately 30 seconds to two minutes. (N.T. October 19, 1993, pp. 12-13, 21.) The defendant then opened the door just enough so that Mr. Robinson could display his identification. (N.T. October 19, 1993, p. 22.) Officer White then asked the defendant to open the door and, at the same time that Officer White so advised, Officer LaSpina took the defendant's identification and walked into the bathroom with the defendant. Officer LaSpina questioned Mr. Robinson regarding his identification, during which questioning the officer smelled the odor of smoke. At that time, Officer LaSpina observed burnt matches on the floor, as well as a white powder and a vial cap on top of the sink. (N.T. October 19, 1993, p. 23.) Due to his experience and training as a police officer, Officer LaSpina believed the powder to be an illegal substance. (N.T. October 19, 1993, pp. 23-24.)

Officer LaSpina then patted down Mr. Robinson to ascertain the safety of the situation. (N.T. October 19, 1993, pp. 24-25.) During this inspection, Officer LaSpina found one package believed to be cocaine and one package believed to be marijuana. *(Id.)* Officer LaSpina then placed Mr. Robinson under arrest. *(Id.)*

## III. ISSUES

On appeal, the defendant has presented a single issue: that "the trial court erred in denying Robinson's motion to suppress; specifically the trial court erred in concluding that it was proper for the arresting officer to enter and search the bathroom and the person of Jeffrey Robinson after he produced identification showing him to be an employee on work premises in response to the officer's inquiry." (See defendant's statement of matters complained of on appeal.)

More specifically, this one issue argued by the defendant breaks down into the following three sub-issues:

(A) whether Mr. Robinson had any expectation to privacy in the ladies' room in which he was found;

(B) whether the items seen in the bathroom were subject to the "plain view" doctrine; and

(C) whether the officers were legally present and legally questioned the defendant (*i.e.* *"Terry"* stop and/or probable cause sufficient to arrest and search incident to arrest).

## IV. DISCUSSION

(A) A discussion of this matter begins with an analysis of the Fourth Amendment itself, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized." *Commonwealth v. Buckman*, 393 Pa. Super. 453, 457, 574 A.2d 697, 699 (1990).

Case law has explained that "[t]he protection of the Fourth Amendment does not depend on a property right in the invaded place but does depend on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Commonwealth v. Brundidge*, 533 Pa. 167, 173, 620 A.2d 1115, 1118 (1993). (citation omitted)

The Supreme Court has explained that: "[a]lthough the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.' (citation omitted) On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order." *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740 (1985).

The *T.L.O.* court further advised: "[o]f course, the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise 'illegitimate....' To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is 'prepared to recognize as legitimate.' " *Id.*, 469 U.S. at 338. (citations omitted)

This emphasis on "reasonableness" was also brought out in the case of *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983), "[t]he primary aim of the Fourth Amendment is to protect people from unreasonable intrusions of legitimate expectations of privacy.... It is only legitimate expectations of privacy

which are protected by the constitution. There must be more than a mere subjective desire for privacy; it must be an expectation which society recognizes as reasonable."*Id.* at 598-99, 459 A.2d at 325. (citations omitted) "[I]n determining what is 'reasonable,' all surrounding facts and circumstances must be considered." *Commonwealth v. Lowery* 305 Pa. Super. 66, 72, 451 A.2d 245, 247 (1982).

With this explanation as background, we turn to the facts of the instant matter. There is no question that the officers were legally present on the premises, as Mr. Kane testified that he had called the police/gone to the police station at the request of his supervisor. ("[A] warrantless search may be made with the voluntary consent of a third party who possesses 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.' " (citation omitted) *Commonwealth v. Lowery, supra* at 73, 451 A.2d at 248. The *Lowery* court held that "[w]here such joint access or control exists, there can be no reasonable or legitimate expectation of privacy." *Id.*) Further, the police were admitted to the premises by Mr. Kane, pursuant to his authority as a Bell employee. ("[W]here two or more people have joint access and control over certain property, the voluntary consent of any of those people will provide the basis for a valid consensual search." *Id.* at 74, 451 A.2d at 248.)

Therefore, the initial issue is whether the police were legally present in the room in which Mr. Robinson was found, which discussion begins with an examination of the nature of the room itself. This room was described as a "ladies' bathroom," although the defendant stated that "[i]t would be for the ladies unless somebody else

was, you know, I was just right there and the ladies' room was right there. It was close by. I just used the ladies' room instead of walking all the way around to the men's room. I was working right at the table there, so I walked into the ladies' room." (N.T. October 19, 1993, p. 40.)

The defendant also described the room as "used for storage of equipment, towels and stuff like that."(N.T. October 19, 1993, p. 41.) Finally, the defendant described the bathroom as "a supply room where every man in the garage has access to it any time of the day." (N.T. January 25, 1994, p. 14.)

The description of the room by the defendant himself evidences the fact that this room was used by all the employees on the premises. The Fourth Amendment has been held to apply "only when the defendant has the right to keep a place private and subject to his exclusive control...." *United States of America v. Jose Acosta*, 965 F.2d 1248, 1252 (3d Cir., 1992) (defendants had no expectation of privacy in unlocked inner hallway of apartment building).

The case of *Commonwealth v. Lowery, supra,* identifies further the issues and test to be used in a determination of reasonable privacy. "Property rights, actual usage, and historical distinctions are all used to determine whether the Fourth Amendment right to privacy applies." *Id.* at 71, 451 A.2d at 247. The *Lowery* court explained that "[i]n general, to have a reasonable expectation of privacy, one must intend to exclude others and must exhibit that intent.... Furthermore, as most commonly expressed, the privacy test is twofold: the expectation must not only be 'actual (subjective,)' but also one that 'society is prepared to recognize as reasonable.' " *Id.* (citation omitted)

"In determining what is 'reasonable,' all surrounding facts and circumstances must be considered." *Id.* at 72, 451 A.2d at 247. (citation omitted) In the case presently before the court, the defendant himself testified that the room in which he was found was a ladies' room. Further, he testified that this room was used by all of the employees of the garage, as this room was also used as a storage room. The only factor by which one could view a "reasonable" expectation of privacy on the part of the defendant was from the fact that the bathroom door was locked, not at the time Mr. Kane was initially on the premises, but just at the time that the officers appeared on the premises and immediately prior to the time that the defendant himself unlocked the door. However this, without more, does not itself confer a "reasonable" expectation of privacy on the part of the defendant. Further, at the time that Mr. Robinson unlocked the door, he was obviously not using the room as a restroom and therefore did not need the privacy one would normally expect from a restroom.

The case presently before the court is analogous to the case against William Curtin, one of the defendants in the case of *U.S. v. Conley*, 813 F. Supp. 372, *rev'd* 4 F.3d 1200 (W.D. Pa. 1993). In that case, the issue was with regard to the search of commercial premises. Although the court found that there had been an illegal search and seizure with regard to the employees of the premises, in that the business was not a "closely regulated industry," and the facts enumerated pointed to a reasonable expectation of privacy, one of the defendants was found not to have such a reasonable expectation. Defendant, William Curtin, was the general manager of the Duffy Vending Company, which shared

space on the premises and had materials on the premises. However, the court in that matter found that "[b]ecause the record shows no substantial connection, by way of a desk, office, property, or regular presence, between William Curtin and the premises of 930 Saw Mill Run Boulevard, the court concludes that he cannot have a reasonable expectation of privacy sufficient to challenge the search, whatever his subjective expectations may have been." *Id.* at 378. (citation omitted)

When one looks at the surrounding circumstances, *i.e.* that the room was used by all of the employees and that the defendant himself knew of this, it is evident that even the defendant himself had no real "reasonable" expectation of privacy in the ladies' bathroom that also functioned as a storage room on the premises. As such, the Fourth Amendment would not come into play with regard to the search of that room.

(B) Moreover, as can be seen by the second issue involved in the defendant's appeal (and motion to suppress), the items found on the sink in the ladies' bathroom would also come in under the rubric of the "plain view" doctrine. Officer LaSpina, of the Morton Borough Police Department, testified:

"The District Attorney: Could you describe in detail how the door was open, how far, and how he was displaying the badge for the court, please?

"Officer LaSpina: The door was open a very small amount where he would—an amount where you could get your arm through, and he was displaying the badge at the end of the door to me, in this motion holding it up.

"The District Attorney: Were you able, at that point, to see any portion of his body or his face or just the arm and the badge?

"Officer LaSpina: I was able to see the arm and the badge and some type of figure behind the door.

"The District Attorney: Now, the door itself, did that open out or did that open in towards the bathroom, do you recall?

"Officer LaSpina: I believe it opened in.

"The District Attorney: And after he showed you the badge, what, if anything, occurred then?

"Officer LaSpina: At that point, I opened the door and Officer White told him to open the door, please. I took his ID badge or his ID that he was displaying to me and walked into the bathroom with him. I asked him who he was and what he was doing there. And (sic) that point, I could smell an odor of smoke which was a sulfur of matches.

"The District Attorney: Did you observe any—you said you smelled an odor of smoke. Did you observe anything else in the restroom when you went in?

"Officer LaSpina: Yes, I checked the surroundings and I immediately looked in (sic) the floor and I observed matches that were burnt matches that were lit and put out. I observed on the top of the sink, a white powder and also a vial cap, purple cap I believe it was.

"The District Attorney: Now, the white powder, you indicate I believe you've been a police officer for seven years, did you say?

"Officer LaSpina: That's correct.

"The District Attorney: Have you, in the course of your seven years, run into this particular type of white powder in your police experience?

"Officer LaSpina: Yes, I have.

"The District Attorney: And have you had any type of training in recognizing that particular powder?

"Officer LaSpina: Yes, I have.

"The District Attorney: Did you, at that point, recognize the powder?

"Officer LaSpina: Along with the white powder and the cap, I believed it to be an illegal substance.

"The District Attorney: Okay. Of what significance was the cap?

"Officer LaSpina: The cap is consistent with packaging of cocaine and crack.

"The District Attorney: And where was the powder and the cap located, sir?

"Officer LaSpina: On a shelf that was on top of the sink.

"The District Attorney: And approximately how far from that—from the door was that shelf and the sink?

"Officer LaSpina: Right in front of the sink. It's a very small room." (N.T. October 19, 1993, pp. 22-24.)

Once the officer had entered into the ladies' room, the items themselves were, as testified to by Officer LaSpina, in plain view on the sink in that room.

"In considering the plain view doctrine, the Pennsylvania courts have determined that, in order for the doctrine to apply, the following requirements must be satisfied: (1) the initial intrusion must be lawful; (2) the item must have been inadvertently observed; and (3) there must be probable cause to link the observed property with criminal activity." *Commonwealth v. Daniels*, 406 Pa. Super. 112, 116, 593 A.2d 895, 897, (1991).

The *Daniels* court elaborated:

"It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions

that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view, its incriminating character must also be 'immediately apparent.' ... Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Id.*

The *Daniels* court did differentiate between those cases where the observation occurred before the intrusion into the premises and those cases where the observation occurred after the police were already lawfully on the premises. Where, as here, the observation occurred only after the police were lawfully in the ladies' bathroom, "because the justifiable intrusion has occurred, no further intrusion is occasioned by the seizure of evidence which is in plain view and the seizure is permitted without more...." *Id.* at 116 n.4, 593 A.2d at 897 n.4. (citation omitted) The *Daniels* court explained: "[w]hen police officers who are 'justifiably at the scene [see] contraband in plain view,' however, the observation 'is not a search within the meaning of the Fourth Amendment.... [and] no warrant is required.'" *Id.* at 118, 593 A.2d at 898.

In analyzing the case presently before the court, we begin with the premise that the police were lawfully on the premises, as discussed, *supra*. When we proceed to the second criteria under the "plain view" doctrine, it is further apparent that the evidence was lawfully seized. The police had no idea that there were drugs on the premises; rather, they were called to the site because Mr. Kane, an employee of Bell Telephone, the occupier of the premises, heard strange noises coming from the ladies' room at 2:30 a.m. It was not until the door to the ladies' room was opened by the defendant and the officer proceeded into the bathroom that the

substances were spotted by the officer on the sink. Further, due to the officer's experience, he recognized what he believed to be controlled substances, which opinion was later confirmed by testing. Finally, "we must consider whether the police officers had probable cause to believe that the [substances] were evidence of criminal activity." *Id.* at 119, 593 A.2d at 898. The probable cause standard "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be contraband or stolen property or *useful as evidence of a crime;* it does not demand any showing that such a belief be correct or more likely true than false. 'A practical, non-technical probability that incriminating evidence is involved is all that is required.' " *Id.* at 119, 593 A.2d at 898-99. (emphasis in original) (citation omitted)

In the present case it was reasonable to believe that the items on the sink were contraband, given the officer's prior experience in these matters. Therefore, all the criteria for the "plain view" doctrine to apply were present in the instant matter.

(C) The final issue is that of the search of the defendant and seizure of the contraband on his person made subsequent to the observation of the items found on the sink. The police officer at that time conducted a search of the defendant in order to safeguard his own safety, as well as the safety of the other officer and Mr. Kane.

"Pennsylvania cases hold that it is the reasonableness of a police officer's actions that determine the constitutionality of a search and seizure.... [T]he reasonableness of a search depends on the balance between the public interest and an individual's right to be free from arbitrary interferences by law enforcement officers.... [W]e must balance the safety of the police

officer against [the defendant's] right to be free from arbitrary searches." *Commonwealth v. Austin*, 428 Pa. Super. 466, 472, 631 A.2d 625, 627 (1993). (citations omitted)

The *Austin* court advised further that "[i]t is well-settled that an encounter that occurs late at night is inherently more dangerous than one that occurs during the day, particularly when the suspects appear shaky and inordinately nervous, ...." *Id.* at 472, 631 A.2d at 628.

In the present matter, the incident took place at 2:30 a.m. Mr. Kane testified that "I never saw anybody there at that time of the morning and, you know, I was kind of suspicious that, you know, that I didn't know whether he was a Bell guy. I figured if he was a Bell guy, he would have said something to that effect." (N.T. October 19, 1993, p. 10.) The police officer testified in regard to the pat-down of the defendant:

"The District Attorney: Now, when you first went into the bathroom, when you first saw the ID badge presented to you, did Mr. Robinson explain why he was in the bathroom at that time?

"Officer LaSpina: I believe he did, yes.

"The District Attorney: What was his explanation?

"Officer LaSpina: I really can't recall. I believe he was—said he was just in the bathroom. I can't recall. I can't say what his exact statement was.

"The District Attorney: What happened then, sir?

"Officer LaSpina: I patted Mr. Robinson down.

"The District Attorney: Why did you do that?

"Officer LaSpina: For my safety and safety of the other officers.

"The District Attorney: And this was after you had already observed the matches and the controlled sub-

stance, or what you believed to be controlled substance on the shelf?

"Officer LaSpina: That's correct." (N.T. October 19, 1993, pp. 24-25.)

In this particular case, the officer had already seen the matches and controlled substance on the shelf. Therefore, the officer had suspicions that criminal activity was afoot. Due to the presence of illicit drugs on the sink, and for the safety of the officers and civilian present on the premises at 2:30 a.m., it was necessary at that point for the officer to conduct a search of the defendant.

"Beginning with *Terry v. Ohio*, ..., however, the Supreme Court recognized that certain investigative seizures of an individual need not be supported by probable cause. In *Terry*, the court held that a police officer may conduct a 'stop and frisk' of an individual 'for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest' so long as the officer is 'able to point to specific and articulable facts which give rise to a reasonable suspicion of criminal activity....' Indeed, our own Supreme Court has stated that *Terry* and its progeny recognize 'that some seizures covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as the police have an articulate basis for suspecting criminal activity....' The question of when an investigative stop crosses the line and becomes an arrest is often a perplexing one.... [T]he focus of the analysis must always be 'the reasonableness in all the circum-

stances of the particular governmental invasion of a citizen's personal security,' which is determined by balancing 'the public interest and the individual's right to personal security free from arbitrary interference by law officers....' the reasonableness of the intrusion is determined by examining two factors: (1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." (citations omitted) *Commonwealth v. Elliott*, 376 Pa. Super. 536, 544-45, 546 A.2d 654, 658 (1988), *appeal denied*, 521 Pa. 617, 557 A.2d 721 (1989), and *Appeal of Elliott*, 521 Pa. 621, 557 A.2d 724 (1989).

In an opinion subsequent to that of *Terry v. Ohio*, the Supreme Court elaborated on the standards set forth in *Terry*.

"In *Terry* this court recognized that a 'police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' *Id.* at 22. *The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response....* A

brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time....

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, he may conduct a limited protective search for concealed weapons." *Adams v. Williams*, 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed. 2d 612 (1972). (citations omitted) (emphasis added)

The *Terry* court itself enunciated that: "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1883 (1968). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

"When deciding whether reasonable suspicion of criminal activity was present, we stressed that 'it is incumbent upon us to recognize and account for the fluid nature of events as they were perceived by the officers at the time.' " *Commonwealth v. Campbell*, 418 Pa. Super. 391, 399, 614 A.2d 692, 696 (1992). (citation omitted)

As dictated by the various appellate courts, the particular circumstances at the time must be viewed in order to ascertain whether the officers acted reasonably

and appropriately. The incident in this instance took place at approximately 2:30 a.m. The officers were called to the premises by an acknowledged employee of Bell Telephone. Upon arriving at the premises, they found a male allegedly using the ladies' room in the garage, which the defendant himself indicated was used by all employees as a storage room. Further, the male would not open the door all the way but did stick his hand and head through the door to produce alleged identification of himself as a Bell employee, although Mr. Kane, the acknowledged Bell employee had never seen him before and had definitely never seen him before on the premises at that hour. The officer, in his questioning of the defendant, smelled sulfur in the bathroom, saw matches on the floor, and saw what he believed to be a controlled substance on the shelf in the bathroom. As in the *Johnson* case, "there existed more than ample cause to reasonably suspect that appellant was engaged [with] drug[s] ... at the time the officer encountered him. As such, we may take judicial notice of the reasonable suspicion that the [defendant] was armed and dangerous." *Commonwealth v. Johnson*, 429 Pa. Super. 158, 167, 631 A.2d 1335, 1339 (1993). (citation omitted) (defendant was believed to have been engaged in drug dealing at the time he was approached by the police).

The *Johnson* court held that "[w]here it is 'immediately apparent' from the tactile impression that the suspect possesses contraband on his person, a seizure of the contraband is justified." *Id.* at 168, 631 A.2d at 1340. That court justified the seizure as follows: "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or

mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context." *Id.* at 166, 631 A.2d at 1339-1340.

As noted, *supra*, the officer testified that he conducted a pat-down of the defendant for the safety of himself and the others on the premises at the time. This is warranted, as noted by the *Johnson* court, as the officer had already spotted what he believed to be contraband on the shelf in a ladies' room, being used by a man, at 2:30 a.m. Since the search was warranted as a *Terry* stop, the seizure of the contraband found on the defendant is also warranted. The officer testified:

"Officer LaSpina: And at that point, I found on his person to have green packages believed to be mari— believed to be cocaine, and also a package believed to be marijuana.

"The District Attorney: Where were they found?

"Officer LaSpina: On his person in his pockets.

"The District Attorney: What happened next, sir?

"Officer LaSpina: At that point, I placed him under arrest, Mr. Robinson under arrest, and transported him to the police station and performed a field test on the white powder substance. It came up positive for cocaine. At that point—later the cocaine was taken, or the white powder was taken to the lab and I received a lab report back that proved positive for cocaine." (N.T. October 19, 1993, p. 25.)

Under the criteria enunciated by the Supreme Court in *Terry*, the search conducted by the officer was warranted in order to ascertain the safety of the officers

and others present. The fact that contraband was found on the person of the defendant, in the form of cocaine and marijuana, does not render the search or seizure inadmissible. Rather, as noted by our Superior Court in the *Johnson* case, the fact that the officer knew that he was dealing with contraband justifies the seizure under the same criteria as that which justified the *Terry* search in the first place.

## CONCLUSION

The defendant in this matter sought suppression of the items found on the sink in the ladies' bathroom in which he was found at 2:30 a.m., as well as suppression of the items found on his person during a *Terry* search. This court found that Mr. Robinson had no reasonable expectation of privacy in the bathroom in which he was found, due to the fact that this was a room to which all employees had access, among other considerations.

Further, the items which were seized from the bathroom shelf were in plain view of the officers once they had entered the bathroom. This court finds that all the criteria for the "plain view" doctrine were met and the items therefore legally seized.

Finally, the search which was conducted of the defendant himself was done so for the protection of the officers, who had reasonable suspicions that the defendant might be armed and dangerous. Pursuant to the *Johnson* case, the contraband found on the defendant as a result of that search was also legally seized.

For these reasons, and for all the other reasons more fully set forth in this court's opinion, this court denied the defendant's post-trial motion.